UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—
GENERAL

| Case No. | 5:25-cv-01873-SSS-BFM | Date | December 18, 2025 |
|---|---|---|---|
| Title | *Lazaro Maldonado Bautista et al v. Ernesto Santacruz Jr et al.* | | |

Present: The Honorable    SUNSHINE S. SYKES, UNITED STATES DISTRICT JUDGE

| Irene Vazquez | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Petitioner(s): | Attorney(s) Present for Respondent(s): |
|---|---|
| None Present | None Present |

**Proceedings:    (IN CHAMBERS) AMENDED ORDER CONSOLIDATING THE COURT'S ORDERS ON MOTION FOR PARTIAL SUMMARY JUDGMENT, CLASS CERTIFICATION, AND APPLICATION FOR RECONSIDERATION OR CLARIFICATION [DKT. NOS. 81, 82, 87]**

As indicated in the Court's Order Granting in Part and Denying in Part Petitioners' Application for Reconsideration or Clarification, the Court issues for sake of clarity this Amended Order consolidating the prior orders on Petitioners' Motion for Partial Summary Judgment, Motion for Class Certification, and Application for Reconsideration or Clarification. [Dkt. No. 91, "Clarification and Modification Order"].[1]

---

[1] Consistent with Rule 60(a), the clarifications in this Amended Order do not make substantive corrections to the effect of its prior orders. Any discussion in this Order not present in the Court's initial orders pertain to jurisdictional issues, which the Court must address. The portion of this Amended Order incorporating the Court's reconsideration of its prior denial to enter final judgment and subsequent entry of final judgment is the only substantive change. Such changes are permissible and governed by Rule 60(b)(6).

## I.    FACTUAL AND PROCEDURAL BACKGROUND

On June 6, 2025, a series of coordinated immigration raids began across Southern California, resulting in the arrest and detainment of around 2,000 individuals per day that week.[2]  This case centers around individuals directly affected by those events.

***The Petitioners.***    Among the arrested were Petitioners, each of whom are foreign nationals arrested pursuant to warrants issued by Homeland Security Investigations ("HSI") and/or Immigration and Customs Enforcement ("ICE") agents on June 6, 2025, in downtown Los Angeles, California.  [Dkt. No. 1 at 5–6, "Habeas Petition"; Dkt. No. 5-2 at 4, 8, 12, 17, "TRO Application" or "TRO App."].[3]  On the day of their arrests, Petitioners were each charged with being inadmissible under 8 U.S.C. § 1182(a)(6)(A)(i), or as being present without admission in the United States.  [Habeas Petition ¶¶ 43, 48, 53, 58].

Each of the Petitioners requested bond hearings, all of which were denied by an Immigration Judge ("IJ") between July 15, 2025, and July 22, 2025. [*Id.* ¶ 5; Dkt. No. 5-2, Exs. E, F, G, H, "Bond Orders"].  In each of the Bond Orders, the IJ cited to Section 235(b) of the INA (*i.e.*, 8 U.S.C. § 1225) as grounds for lack of jurisdiction.  [*Id.*].  The Bond Orders were based in a recent change in policy by the Department of Homeland Security ("DHS").

***The Policy Change.***    On July 8, 2025, the Department of Homeland Security (DHS) instituted a notice titled "Interim Guidance Regarding Detention Authority for Applicants for Admission."  [Dkt. No. 5-2 at 45–46, "DHS Guidance Notice" or "DHS Policy"].  The Notice communicated DHS's choice, in coordination with the Department of Justice ("DOJ") to "revisit[] its legal position on detention and release authorities," determining that Section 235 of the Immigration and Nationality Act ("INA") would serve as the applicable immigration detention authority rather than Section 236 for all "applicants for admission." [*Id.*].  In other words, the change in policy requires ICE employees to consider anyone arrested in the United States and charged with being inadmissible as an "applicant for

---

[2] *See* Department of Homeland Security, *DHS Releases Statement on Violent Rioters Assaulting ICE Officers in Los Angeles, CA and Calls on Democrat Politicians to Tone Down Dangerous Rhetoric About ICE*, (June 7, 2025) [https://perma.cc/RJE5-PACW].

[3] Petitioner Franco Galdamez was arrested by Border Control agents around June 19, 2025, in Los Angeles during an ICE operation.  [Habeas Petition at 6].

admission" under 8 U.S.C. § 1225(b)(2)(A).  Under § 1225(b)(2)(A), "applicants for admission" are subject to mandatory detention for proceedings under 8 U.S.C. § 1229(a) and not entitled to the due process protections found within § 1226(a).

***Petitioners Seek Relief.***  Because of the new DHS Policy, Petitioners were denied bond hearings and remained in detention at the Adelanto Detention Center in Adelanto, California.

On July 23, 2025, Petitioners filed a Petition for Writ of Habeas Corpus raising several challenges against the DHS change in policy, including violations of 8 U.S.C. § 1226(a), the Fifth Amendment Right to Due Process, and the Administrative Procedure Act ("APA").  [Dkt. 1 at 20–21].  That same day, Petitioners filed an Application for a Temporary Restraining Order.  [*See* Dkt. 5-1, Application for Temporary Restraining Order or "TRO App."].  Petitioners requested that the Court enjoin Respondents from detaining Petitioners unless they are provided with individualized bond hearings before an IJ.  [TRO App. at 3].  Petitioners additionally sought an order to prohibit Respondents from relocating Petitioners outside this District pending final resolution of this litigation.  [*Id.*].  This Court granted the application on July 28, 2025.  [*See* Habeas Petition; Dkt. No. 14, "TRO Order"].

***Events Following the TRO.***  In granting the TRO, the Court ordered Respondents to provide Petitioners with an individualized bond hearing or release Petitioners from detention.  [*Id.* at 13].  On the same day the Court granted Petitioners' *ex parte* application for a TRO, Petitioners amended their complaint to include class allegations and requests for declaratory relief as to the legality of Respondents' policies relating to denying bond hearings.  [*See generally* FAC].

Respondents then filed a response to the Court's order to show cause on August 8, 2025.  [Dkt. 40].  This response provided evidence that each of the Petitioners was provided with an individualized bond hearing and subsequently released on bond.  [*See id.*].

***Current Posture.***  On August 11, 2025, Petitioners filed their Motion for Partial Summary Judgment, seeking to declare the new DHS Policy as unlawful.  [Dkt. No. 42, "MSJ"].  Respondents filed their opposition on September 12, 2025, to which Petitioners have filed a response.  [*See generally* Dkt. No. 60, "MSJ Opp."; Dkt. No. 62, "MSJ Reply"].

On August 11, 2025, Petitioners also filed their Class Certification Motion, seeking declaratory relief and vacatur against Respondents' policies for two proposed classes:

- **Bond Eligible Class**: All noncitizens in the United States without lawful status who (1) have entered or will enter the United States without inspection; (2) were not or will not be apprehended upon arrival; and (3) are not or will not be subject to detention under 8 U.S.C. § 1226(c), § 1225(b)(1), or § 1231 at the time the Department of Homeland Security makes an initial custody determination.

- **Adelanto Class**: All noncitizens in the United States without lawful status who (1) have or will have proceedings before the Adelanto Immigration Court; (2) have entered or will enter the United States without inspection; (3) were not or will not be apprehended upon arrival; and (4) are not or will not be subject to detention under 8 U.S.C. § 1226(c), § 1225(b)(1), or § 1231 at the time the noncitizen is scheduled for or requests a bond hearing.

[*See* Class Certification Motion at 14].

On November 14, 2025, the Court heard argument from the parties on both motions. At the hearing, the parties agreed to proceed with the Bond Eligible Class only consistent with their briefing on the redundancy of the Adelanto Class. [*See also* Dkt. No. 59 at 24, "Class Cert. Opp."; Dkt. No. 61 at 4 n.1, "Class Cert. Reply"].

On December 4, 2025, Petitioners filed an Application for Clarification and Reconsideration, which details how Respondents have "persisted in denying class members bond hearings in two ways." [Dkt. No. 87, "Reconsideration Application" or "Reconsideration App."; Dkt. No. 91, "Reply to App."]. Respondents opposed that Reconsideration Application as well. [Dkt. No. 90, Opposition or "Opp. to App."]. Various supporting exhibits to the Application confirm that IJs continue to deny bond hearings for members of the Bond Eligible Class. [Dkt. No. 87-2 at 11 (suggesting this Court "did not issue a class-wide declaratory judgment"); Dkt. No. 87-2 at 14 (same); Dkt. No. 87-5 at 6 (same); Dkt. No. 87-7 at 4, 6 (same); Dkt. No. 87-8 at 5 (same); Dkt. No. 87-9 at 3 (same); Dkt. No. 87-12 at 3 (same); Dkt. No. 87-14 at 3 (same); Dkt. No. 87-15 at 3

(same); Dkt. No. 87-16 at 3 (same)].  Petitioners argue that these factual circumstances demand entry of final judgment.  [Reconsideration App. at 9–11].

Given the number of threshold issues in this matter, the Court first addresses concerns raised by Respondents regarding justiciability.  The Court then considers the issues of statutory interpretation underlying the parties' disputes pertaining to the legality of the DHS Policy and its bearing on Petitioners.  Finally, with the scope of the Class Certification Motion limited to the Bond Eligible Class only, the Court considers whether class certification is proper.

## II.    JUSTICIABILITY

Article III "requires a federal court to satisfy itself of its jurisdiction over the subject matter before it considers the merits of a case."  *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999).  Once again, Respondents argue that provisions of the Immigration and Nationality Act ("INA") bar this Court from reviewing this matter.  [MSJ Opp. at 18–20; *see also* Dkt. No. 8 at 6–11, "TRO Opp."].

Moreover, ensuring subject-matter jurisdiction is an "independent obligation" on all courts, even in the absence of a challenge from any party.  *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 501 (2006).  Thus, the Court considers *sua sponte* any questions of the applicability of mootness.

### A.    Statutory Restrictions on Judicial Review

Respondents' Opposition argues that the INA "entrusts the Executive branch to remove inadmissible and deportable [noncitizens][4] and to ensure that

---

[4] This Order uses the term "noncitizenship" in place of "alienage" and "noncitizen" in place of "alien."  The Court follows the U.S. Supreme Court and Ninth Circuit, where the use of the term "noncitizen" has become a common practice.  *See Patel v. Garland*, 596 U.S. 328 (2022) (Barrett, J.); *United States v. Palomar-Santiago*, 593 U.S. 321 (2021) (Sotomayor, J.); *Barton v. Barr*, 590 U.S. 222, 226 n.2, (2020) (Kavanaugh, J.) ("This opinion uses the term 'noncitizen' as equivalent to the statutory term 'alien.'" (citing 8 U.S.C. § 1101(a)(3))); *Avilez v. Garland*, 69 F.4th 525 (9th Cir. 2023); *Arce v. United States*, 899 F.3d 796 (9th Cir. 2018).  Additionally, this Court thinks it is prudent to "avoid language that reasonable readers might find offensive or distracting—unless the biased language is central to the meaning of the writing."  *Chicago Manual of Style Online* 5.253, https://www.chicagomanualofstyle.org/book/ed17/part2/ch05/psec253.html.  As noted by the Ninth Circuit, "[t]he word alien can suggest 'strange,' 'different,'

---

[noncitizens] who are removable are in fact removed from the United States." [MSJ Opp. at 17]. The Court has no doubts that the INA confers the executive branch with the powers to faithfully execute the statute's aim. Indeed, Congress expressly precluded judicial review of certain matters within the INA. *See e.g.*, 8 U.S.C. § 1252(a)(2), § 1252(b)(9), § 1252(e)(3)(A). However, the issues presented in this case fall outside the areas in which the INA has stripped courts of jurisdiction.

The Court examines each subsection raised by Respondents in turn.

### 1.    Section 1252(a) and Section 1252(b)(9)

Respondents argue that when reading § 1252(a) and § 1252(b)(9) together, the INA divests district courts of jurisdiction to review both direct and indirect challenges to removal orders. [MSJ Opp. at 19].[5] This is incorrect as to each of the sections of the INA read individually as well as read together.

As discussed in the TRO Order, Section 1252, titled "Judicial Review of Orders of Removal," contains a provision detailing "[m]atters not subject to judicial review." *See* 8 U.S.C. § 1252, § 1252(a)(2). Section 1252(a)(2) contains four subsections, which outlines categories of claims that are not subject to judicial review. § 1252(a)(2)(A)–(D). None of these subsections precluding judicial review apply to this matter, as the specified statutory provisions do not cite to § 1225(b)(2)(A) or § 1226(a), which are the two statutory provisions that the

---

'repugnant,' 'hostile,' and 'opposed[.]'" *Avilez*, 69 F.4th at 527 n.1 (citing *Alien*, *Webster's Third New International Dictionary* 53 (2002)). Accordingly, because the word "noncitizen" is synonymous and does not encompass such negative connotations, the Court finds "noncitizen" is a better word choice. *See Alien* and *Noncitizen*, *American Heritage Dictionary of English Language* 44, 1198 (5th ed. 2011).

[5] In doing so, Respondents cite to *J.E.F.M. v. Lynch* for the proposition that "[t]aken together, § 1252(a)(5) and § 1252(b)(9) mean that *any* issue—whether legal or factual—arising from *any* removal-related activity can be reviewed *only* through the PFR process." [MSJ Opp. at 18 (citing *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1031 (9th Cir. 2016)]. However, this fails to acknowledge the next sentence of that very opinion cites to another Ninth Circuit opinion that clarifies that "jurisdiction over removal proceedings is limited to review of final orders of removal." J.E.F.M., 837 F.3d 1031 (citing *Viloria v. Lynch*, 808 F.3d 764, 767 (9th Cir. 2015)).

Parties agree are at the heart of this matter.  Thus, it remains that no part of § 1252 deprives this Court of jurisdiction.

Similarly, Respondents' jurisdictional challenge based in § 1252(b)(9) presents no new circumstances from the previous challenge raised in its opposition to Petitioners' TRO.  [MSJ Opp. at 18–19].  As of the date of this Order, nothing in the record indicates that any orders of removal have been issued for any of the Petitioners.  Consistent with this Court's TRO Order, § 1252(b)(9) channels review of "*final orders of removal*" to federal courts of appeals.  [MSJ Reply at 5 (emphasis added); *see also* TRO Order at 4–5].  Without an order of removal, § 1252(b)(9) alone does not bar this Court from reviewing Petitioners' Motion for Partial Summary Judgment regarding the legality of the new DHS Policy.

Therefore, these two sections of the INA do not independently nor jointly preclude judicial review.

## 2.    Section 1252(e)(3)(A)

Finally, Respondents suggest § 1252(e)(3)(A) operates as a bar to review by this Court.  [MSJ Opp. at 19–20].  Section 1252(e)(3)(A) provides that "[j]udicial review of determinations under section 1225(b) of this title and its implementation is available in an action instituted in the United States District Court for the District of Columbia" and limits challenges to the constitutionality of a section or regulation, or whether certain regulations, policies, or procedures are inconsistent with the INA or violates other laws.  *See* § 1252(e)(3)(A).

According to Respondents, because Petitioners "challenge an alleged policy of detaining applicants for admission under § 1225(b)," any challenges must be brought within the District Court for the District of Columbia.  [MSJ Opp. at 20].  Petitioners correctly argue that this argument misunderstands Petitioners' claims, as they maintain they are detained under § 1226 and are therefore entitled to receive bond hearings rather than remain in mandatory detention.  [MSJ Reply at 6].

Because the premise of Petitioners' claim is that the proper governing authority over their detention is § 1226 rather than § 1225, the Court does not find § 1252(e)(3)(A) to strip this Court of jurisdiction.

### B.    Mootness

Moreover, ensuring subject-matter jurisdiction is an "independent obligation" on all courts, even in the absence of a challenge from any party. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 501 (2006). Thus, the Court considers *sua sponte* any questions of the applicability of mootness to Petitioners' Motion for Partial Summary Judgment.

The doctrine of mootness applies "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90 (2013). A case that becomes moot no longer presents a case or controversy, and thus cannot be properly before a federal court.

Respondents previously suggested Petitioners' Motion for Partial Summary Judgment, as well as the entire case, is moot because Petitioners lost their stake in this litigation when they received bond hearings. [Dkt. No. 69 at 3–4]. Specifically, Respondents suggest Petitioners' reliance on *Nielson v. Preap*, 586 U.S. 392, is improper. [*Id.* at 5–6]. According to Respondents, because Justices Thomas and Gorsuch declined to join in the jurisdictional portion of the majority opinion, this renders *Preap*'s mootness discussion as a non-binding discussion by a plurality. [*Id.* at 5].

But *Preap* presents little relevance here. In *Preap*, the parties disputed mootness where the district court had certified a class that comprised of individuals in the district subject to mandatory detention under 8 U.S.C. § 1226(c). *Preap*, 586 at 400. Because the named plaintiffs had received relief, the Government argued in *Preap* that the class action was mooted. *Id.* at 403–04.

Here, the Court has not yet considered Petitioners' Class Certification Motion.[6] Thus, *Preap*'s discussion of mootness presenting jurisdictional barriers there does not provide clear guidance here. Rather, the portion of *Preap* that

---

[6] When the Court had initially issued the MSJ Order, it had not yet granted class certification. Given that the Court has now granted the Motion for Class Certification, *Preap* presents a more similar procedural posture than before. However, the Court's determination regarding mootness remains the same; *Nielson* found unless a court's order "was made permanent and was not disturbed on appeal, [plaintiffs] faced the threat of re-arrest and mandatory detention." 586 U.S. at 403. Petitioners have provided evidence regarding Respondents' adherence to the DHS Policy, which supports the existence of a live controversy.

resonates here is that some of the plaintiffs in *Preap* "faced the threat of re-arrest and mandatory detention." *Preap*, 586 U.S. at 403.

Before this Court are exclusively the legal issues presented by the named Petitioners regarding the legality of the new DHS Policy. The focus of the mootness inquiry is on whether Petitioners present a live controversy—not the Petitioners' relationship to the putative class.

Petitioners in this case have not received complete relief due to the real risk of re-arrest and mandatory detention. [Dkt. No. 63 at 9]. Petitioners cite to four instances since their Motion for Partial Summary Judgment in which Respondents have again arrested and re-detained similarly situated individuals and subjected them to mandatory detention. [*Id.*]. Moreover, it has now become binding precedent in immigration courts that the DHS Policy is lawful. *See Matter of Yajure-Hurtado*, 29 I. & N. Dec. 216 (BIA 2025),

This Court finds Petitioners still maintain a live controversy, by virtue of the exceptions to the mootness doctrine, namely, concerns regarding voluntary cessation. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000).

Respondents suggest Petitioners cannot establish any exception to mootness because any threat of re-detention is "completely speculative and premised on the assumption that [Respondents] will violate this Court's order." [Dkt. No. 69 at 7]. The underlying basis for Respondents' argument is self-defeating. As Respondents will have it, the threat of Petitioners' re-detention is "speculative," even though Petitioners cite to cases indicating the exact circumstances from which they seek relief, because those cases are "distinct" in that those individuals "should have been subject to mandatory detention under § 1225(b)(2)." [*Id.* at 6–7]. But Respondents argue in their Opposition for that exact proposition: that "Petitioners are subject to detention under § 1225(b)(2) because they are applicants for admission." [MSJ Opp. at 20]. At Respondents' perhaps involuntary admission, these facts present a prototypical example of voluntary cessation.

As the Supreme Court stated, "a defendant cannot automatically moot a case simply by ending its unlawful conduct once sued." *Already*, 568 U.S. at 91. This doctrine supports the premise that "a party should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior." *City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 284 n.1 (2001). By seeking to view this case as moot ignores the reality that Respondents have acted

upon and maintain their position that Petitioners are applicants for admission, and thus should be subject to mandatory detention under § 1225(b)(2). This case is very much still live, as Respondents have not demonstrated there is no reasonable expectation that Petitioners will not be re-arrested and re-detained.

*            *            *

Having established no jurisdictional barriers exist, the Court now considers Petitioners' Motions for Class Certification and Partial Summary Judgment.

## III.   LEGAL STANDARD

### A.   Summary Judgment

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Fed. R. Civ. P. 56(a). A fact is material if the dispute over that fact may affect the outcome of the lawsuit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court need not consider irrelevant and unnecessary factual disputes. *Id.* A dispute is genuine if a reasonable jury could return a verdict for the non-moving party based on the evidence. *Id.* The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

To do so, the moving party must present evidence that either negates an essential element of the non-movant's case or demonstrates the non-movant does not have evidence sufficient to support its case. *Id.* If the movant has met its burden, the non-movant must set forth specific facts showing there is a genuine issue for a trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In deciding a summary judgment motion, a court must believe the non-movant's evidence and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255.

### B.   Class Certification

"A party seeking class certification must satisfy the requirements of Federal Rule of Civil Procedure 23(a) and the requirements of at least one of the categories under Rule 23(b)." *Wang v. Chinese Daily News*, 737 F.3d 538, 542 (9th Cir. 2013).

In determining whether to certify a class, a district court "take[s] the substantive allegations of the complaint as true," however, "the court also is

required to consider the nature and range of proof necessary to establish those
allegations." *In re Coordinated Pretrial Proceedings in Petroleum Prods.
Antitrust Litig.*, 691 F.2d 1335, 1342 (9th Cir. 1982).

### 1.    Rule 23(a) Prerequisites

"Rule 23(a) ensures that the named plaintiffs are appropriate representatives
of the class whose claims they wish to litigate." *Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338, 349 (2011).  A party seeking class certification must demonstrate the
following prerequisites under Rule 23(a): "(1) numerosity of plaintiffs; (2)
common questions of law or fact predominate; (3) the named plaintiff's claims and
defenses are typical; and (4) the named plaintiff can adequately protect the
interests of the class." *Hanon v. Dataproducts Corp.,* 976 F.2d 497, 508 (9th
Cir.1992) (citing Fed.R.Civ.P. 23(a)).  The party may not rest on mere allegations,
but must provide facts to satisfy these requirements.  *Doninger v. Pac. Northwest
Bell, Inc.,* 564 F.2d 1304, 1309 (9th Cir.1977).

The district court must conduct a "rigorous analysis" and conclude that all
four requirements—commonly shorthanded as numerosity, commonality,
typicality, and adequate representation—are satisfied.  *Wang*, 737 F.3d at 542–43
(quoting *Wal-Mart*, 564 U.S. at 349).

### 2.    Rule 23(b)(2) Requirements

"In addition to the requirements of Rule 23(a), a proposed class must also
meet the requirements of one or more of the 'three different types of classes' set
forth in Rule 23(b)." *Senne* v. *Kan. City Royals Baseball Corp.*, 934 F.3d 918, 927
(9th Cir. 2019).  Here, Petitioners seek certification under Rule 23(b)(2).  [Class
Cert. Motion at 36–39].

Rule 23(b)(2) requires that "the party opposing the class has acted or refused
to act on grounds that apply generally to the class, so that final injunctive relief or
corresponding declaratory relief is appropriate respecting the class as a whole."
Fed. R. Civ. P. 23(b)(2).

## IV.    DISCUSSION

### A.    Motion for Partial Summary Judgment

Petitioners' Motion for Partial Summary Judgment seeks to declare the new
DHS Policy unlawful, and asks the Court to enter final judgment pursuant to Rule

54(b).  [*See generally* MSJ].[7]  Respondents' Opposition argues, beyond the jurisdictional issues already discussed, Petitioners are not entitled to summary judgment where Congress has directed Petitioners and those similarly situated to be subject to mandatory detention.  [MSJ Opp. at 20–30].

Because the parties appear to agree that there are no genuine disputes as to any material facts[8], the Court focuses on whether Petitioners are entitled to judgment as a matter of law.  As reflected in the briefings, this is a question of statutory interpretation.

Before examining the statutory text at issue, the Court first provides a primer regarding the statutes, relevant developments to the statutes, and how they operate.  Such background provides necessary context to evaluating the text of the statutory provisions.  *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.").

### 1.    The INA and IIRIRA

The Immigration and Nationality Act of 1952 ("INA"), codified in Chapter 12 of Title 8 of the United States Code, governs all aspects of immigration law.  *See* 8 U.S.C. §§ 1101 *et seq*.  Forming the basis of current immigration laws of the United States, the INA addresses issues of admission qualifications for noncitizens, naturalization and loss of nationality, refugee assistance, and removal procedures for noncitizen terrorists.  *Id.  See also* Margaret C. Jasper, *The Immigration and Nationality Act of 1952*, Legal Almanac: The Law of Immigration (2012).

As reflected in the subchapters of the INA, immigration law involves the interplay between the manifold issues arising from any noncitizen's arrival, stay, departure, or removal from the United States.  *See e.g.*, § 1181(c) (cross-referencing the admission of refugees with the admission of immigrants); § 1201(b) (differentiating registration requirements for noncitizens based on

---

[7] Petitioners further argue that prudential exhaustion is not required in this scenario.  [*See* MSJ at 36–41].  Respondents do not raise any objection to this argument, and the Court finds that prudential exhaustion may be waived for the same reasons discussed in its TRO Order.  [*See* TRO Order].

[8] Respondents only raise disputes to immaterial facts or "to the extent Plaintiffs make any mischaracterization of the law."  [*See* Dkt. No. 60-1].

classes enumerated in § 1101); § 1229(a) (cross-referencing grounds of inadmissibility as affecting removal proceedings); § 1301 (conditioning the issuance of visas in accordance with § 1201).

In 1996, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), which "substantially amended" portions of the INA's judicial review scheme with a "new (and significantly more restrictive) one." *Nken v. Holder*, 556 U.S. 418, 424 (2009). Along with its changes to the availability of judicial review, IRRIRA added § 1225 to the INA, which outlines expedited removal of a certain class of noncitizens. *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 109 (2020). *See also Biden v. Texas*, 597 U.S. 785, 804 (2022). In contrast, the predecessor to the current language of § 1226 existed in the original INA. *See* INA of 1952, Pub. L. No. 414 (66 Stat. 200) (current version at 8 U.S.C. § 1226). Recently, Congress amended portions of § 1226 through the passage of the Laken Riley Act. Pub. L. No. 119-1, January 29, 2025, 139 Stat. 3 (2025).

### 2. Evaluating Inadmissible Noncitizens

8 U.S.C. § 1225 and § 1226 govern how the executive branch evaluates inadmissible noncitizens. Logically speaking, inspection or apprehension of the noncitizen is a necessary precondition of removal. Only after a noncitizen is identified as inadmissible can removal proceedings happen.

Indeed, the Supreme Court has already differentiated these two sections, distinguishing their application by the category of noncitizens to which their provisions apply. *See Jennings v. Rodriguez*, 583 U.S. 281, 289 (2018). *Jennings* held the Government may "detain certain [noncitizens] seeking admission into the country" under § 1225(b) while § 1226 "authorizes the Government to detain certain [noncitizens] *already in the country* pending the outcome of removal proceedings." *Id.* (emphasis added).

In particular, the statutory language of § 1225 details the process by which immigration officers inspect noncitizens arriving in the United States, refer them for hearings, and initiate procedures for expedited removal. *See* § 1225(a) (defining the categories of individuals that immigration officers are to inspect and statements these individuals may provide at inspection); § 1225(b) (detailing the process for conducting inspections, including screening, interviews, and referrals); § 1225(c) (providing grounds for expedited removal involving security concerns); § 1225(d) (outlining immigration officers' authority relating to inspection). On the

other hand, § 1226 describes how noncitizens may be apprehended and detained.
*See* § 1226(a) (supplying an exhaustive list of scenarios noncitizens may face
pending a removal decision, including being released on bond); § 1226(b)
(describing the Attorney General's authority to revoke bond or parole); § 1226(c)
(detailing the category of noncitizens that the Attorney General must take into
custody); § 1226(d) (directing the Attorney General to create a system to identify
criminal noncitizens); § 1226(e) (limiting judicial review of the Attorney General's
discretionary decisions).

Beyond *how* noncitizens are identified as inadmissible, another distinction
between these two sections is that noncitizens detained under § 1226(a) are entitled
to receive bond hearings at the outset of detention.  8 C.F.R. §§ 236.1(d)(1).  *See
also Jennings v. Rodriguez*, 583 U.S. 281, 306 (2018).  As articulated by the Ninth
Circuit, "§ 1226(a) stands out from the other immigration detention provisions in
key respects."  *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1202 (9th Cir. 2022)
(observing that § 1226(a) and its implementing regulations "provide extensive
procedural protections that are unavailable under other detention provision").  Not
only does § 1226(a) provide several layers of review of the agency's initial custody
determination, but it also confers "an initial bond hearing before a neutral
decisionmaker, the opportunity to be represented by counsel and to present
evidence, the right to appeal, and the right to seek a new hearing when
circumstances materially change." *Id.*

Based on the undisputed facts, Petitioners were not inspected by
immigration officers when arriving in the United States, and were already in the
United States at the time of their arrest and being charged as inadmissible.  [Dkt.
No. 60-1 ¶¶ 18, 25, 26, 34, 42, 48].

Maintaining the position underlying their TRO, Petitioners argue that
§ 1226(a)—not § 1225(b)(2)—applies to them and those similarly situated.  [MSJ
at 23–36].  Respondents again argue that § 1225(b)(2) is the governing authority
for "applicants for admission", which includes Petitioners.  [MSJ Opp. at 20–29].
In simpler terms, the parties dispute whether Petitioners are "applicants for
admission," a category dispositive of whether Petitioners are subject to mandatory
detention pending their removal proceedings.  If Petitioners are "applicants for
admission," § 1225 governs, and they would not be entitled to bond hearings under
§ 1226(a).

But who is an "applicant for admission," and is that phrase relevant as to Petitioners?

### 3. Plain Language of the INA

Both parties assert that the plain language of the INA supports their interpretation. [MSJ at 23, 29–30; MSJ Opp. at 20–21; MSJ Reply at 13]. Petitioners state the application of § 1226(a) "does not turn on whether someone has been previously admitted," and affords access to bond to noncitizens that are inadmissible. [MSJ at 23]. Moreover, Petitioners argue that the text of § 1225 "reflects a limited temporal scope." [*Id.* at 29]. Because § 1225(b)(2)(A) requires an "active construction" of the phrase "seeking admission" for "applicants for admission," it cannot apply to Petitioners. [*Id.* at 30].

In response, Respondents argue Petitioners are "applicants for admission" because § 1225(b)(2) is a "catchall provision" that applies to all applicants for admission not covered by § 1225(b)(1). [MSJ Opp. at 21, (citing *Jennings*, 583 U.S. at 287)]. According to Respondents, "applicants for admission" "fall into one of two categories, those covered by § 1225(b)(1) and those covered by § 1225(b)(2)." [MSJ Opp. at 21 (citing *Jennings*, 583 U.S. at 297)]. Such an argument relies on the assumption that "applicants for admission" encompasses *all* noncitizens coming into and already in the United States. If this assumption is true, then Respondents are correct. But this cannot be correct.

Respondents' argument is at odds with the plain language of the INA. Neither party contends with the definition section of the INA, which readily resolves this dispute over statutory interpretation.

### i. The INA's Definition Section

The preeminent canon of statutory interpretation requires courts to "presume that [the] legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat. Bank v. Germain,* 503 U.S. 249, 253–54 (1992). Thus, even where the parties have advanced various arguments to support their competing interpretations, the Court must "begin[] with the statutory text, and ends there as well if the text is unambiguous." *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004). Barring unusual cases, "[s]tatutory definitions control the

meaning of statutory words." *Lawson v. Suwannee Fruit & S.S. Co.*, 336 U.S. 198, 201 (1949).[9]

Found in § 1101 is the INA's definition section. *See* § 1101(a)–(h). Relevant here, the INA defines "[noncitizen]" as "any person not a citizen or national of the United States"; "application for admission" as "the application for admission into the United States and not to the application for the issuance of an immigrant or nonimmigrant visa"; and "admission" and "admitted" as "the lawful entry of the [noncitizen] into the United States after inspection and authorization by an immigration officer. *See* §§ 1101(a)(3), (a)(4), (a)(13)(A).[10]

Later in the INA, § 1225(a)(1) provides that "[a noncitizen] present in the United States who has not been admitted or who arrives in the United States . . . shall be deemed for purposes of this chapter an applicant for admission." § 1225(a)(1). "Applicants for admission"—when replacing "admitted" with its definition from § 1101(a)(13)(A)—are noncitizens who have not "lawful[ly] entered] into the United States *after inspection and authorization by an immigration officer.*'" *See* § 1101(a)(13)(A) (emphasis added); § 1225(a)(1).

In suggesting § 1225(b)(2) nevertheless encompasses Petitioners as "applicants for admission," Respondents ignore a crucial portion of *Jennings*. [MSJ Opp. at 21]. It is true that § 1225(b)(2) applies to "other [noncitizens]" who "is an applicant for admission, if the examining immigration officer determines that [a noncitizen] seeking admission is not clearly and beyond a doubt entitled to be admitted." § 1225(b)(2). But *Jennings* considered § 1226 as existing in harmony with § 1225(b)(2), where § 1226(a) "authorizes the Government to detain

---

[9] The Court's holding would not create "obvious incongruities in the [statutory] language" or erase from the statute an entire subsection. *See Lawson*, 336 U.S. at 201. In fact, the Court's interpretation of the INA effectuates the provisions of *both* § 1225 and § 1226, where Respondents' position would render the latter superfluous.

[10] *Torres v. Barr* has already clarified that "applicant for admission" and "application for admission" are not interchangeable. *Torres v. Barr*, 976 F.3d 918, 926–27 (9th Cir. 2020). The Ninth Circuit concurred with the BIA, which had held that "the term 'applicant for admission' in the deeming provision of § 1225(a)(1) 'merely' determines [a noncitizen's] legal status for purposes of removal proceedings." *Id.* at 929.

certain [noncitizens] already in the country pending the outcome of removal
proceedings." 583 U.S. at 289.

Individuals who have not been inspected and authorized by an immigration
officer lack the trait to be categorized as "applicants for admission." The statutory
language of § 1225(b)(2) contemplates a determination by an "examining
immigration officer" regarding a noncitizen's admissibility. *See* § 1225(b)(2).
Nowhere in the record supports the existence of an examining immigration officer
or a requisite determination of inadmissibility that would result in mandatory
detention, as Respondents insist. When considering the statutory definitions of the
INA and the plain text of § 1225, it is unambiguous that "applicants for admission"
do not include noncitizens already in the United States like Petitioners—
individuals that were not determined inadmissible by an "examining immigration
officer."

This is further supported by the heading under which § 1225(a)(1) falls.
This subsection falls under § 1225, which addresses "[i]nspection by immigration
officers; expedited removal of inadmissible arriving [noncitizens]; referral for
hearing." § 1225.

What category, then, do Petitioners fall under? Individuals who are present
in the United States and have not been inspected and authorized by an immigration
officers are merely part of the broadly defined term "[noncitizen]": any person not
a citizen or national of the United States. § 1101(a)(4). As the plain language of
§ 1226(a) supports Petitioners' interpretation, and "no insuperable textual barrier"
hinders this reading, the Court finds that § 1226(a) is the appropriate governing
authority over Petitioners' detention. *See Utility Air Regulatory Group v. E.P.A.*,
573 U.S. 302, 321 (2014).

### ii.    The INA's Statutory Scheme

Where neither § 1225 nor § 1226 are ambiguous, only Petitioners'
interpretation of these statutes "produces a substantive effect that is compatible
with the rest of the law." *United Sav. Ass'n of Texas v. Timbers of Inwood Forest
Assocs., Ltd.*, 484 U.S. 365, 372 (1988). "[R]easonable statutory interpretation
must account for both 'the specific context in which . . . language is used" and the
'broader context of the statute as a whole.'" *Utility Air Regulatory Group*, 573
U.S. at 321 (citing *Robinson v. Shell Oil Co.,* 519 U.S. 337, 341 (1997)). The
Ninth Circuit previously recognized that INA is a "dense statute" that is to be read
"against the backdrop of our constitutional principles, administrative law, and

international treaty obligations."  *Torres v. Barr*, 976 F.3d 918, 923 (9th Cir. 2020)
(citations omitted).

Petitioners argue that § 1225 and § 1226 are distinct regimes meant to
address separate categories of noncitizens.  The latter provides the "default
detention authority" for all persons detained pending a removal decision, while the
former has a limited temporal scope that concerns "inspection" and "expedited
removal of inadmissible arriving [noncitizens]".  [MSJ at 24–29].  *See also*
*Rodriguez v. Bostock*, No. 3:25-CV-05240-TMC, 2025 WL 2782499 at *17 (W.D.
Wash. Sept. 30, 2025) (concluding that a "plain reading of [section 1226] implies
that default discretionary bond procedures in section 1226(a) apply to noncitizens
who . . . are 'present in the United States without being admitted or paroled' under
section 1182(a)(6)(A) but *have not been* implicated in any crimes as set forth in
section 1226(c)."). *See id.* (evaluating the language of § 1226 as "lend[ing] strong
textual support that 'inadmissible' noncitizens . . . are included within section
1226").

Meanwhile, Respondents endorse an interpretation of § 1225 that effectively
removes § 1226 from existence.  Respondents attempt to downplay the
consequences of their proposed position, stating that § 1226 is a mere redundancy
in statutory drafting, or that it is "'congressional effort to be doubly sure' that such
unlawful [noncitizens] are detained."  [MSJ Opp. at 28].  Not so.  If the Court were
to accept Respondents' position that all noncitizens already in the country
(regardless of whether they were inspected and authorized by an immigration
officer) were "applicants for admission," then there would be no possible set of
noncitizens to which § 1226(a) would apply.  Put in another way, Respondents'
proposed interpretation requires that any and all inadmissible noncitizens are also
"applicants for admission."  Such a premise cannot be harmonized with other
portions of the INA.  *See United States v. Castleman*, 572 U.S. 157, 178,
(2014) (Scalia, J., concurring in part and concurring in the judgment) (explaining
that the "presumption against ineffectiveness" means "that Congress presumably
does not enact useless laws").  *See also* Antonin Scalia & Bryan A. Garner,
Reading Law: The Interpretation of Legal Texts 174–79 (2012) (regarding the rule
against surplusage).

There must be an appreciable or meaningful distinction between § 1225 and § 1226.[11]  The text of these subsections reveals a crucial difference in their treatment of detention.  Detention under § 1226 is permissive; detention under § 1225 is mandatory.  The Ninth Circuit previously concluded "permissive and mandatory descriptions are in harmony, as they apply to different situations." *Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1081 (9th Cir. 2015).

Thus, Respondents' expansive interpretation of "applicants for admission" would effectively nullify a portion of the INA through the DHS's legislative or interpretive exercise of power.  Neither is appropriate under the separation of powers.  *See Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 386 (2024) (establishing that "[t]he views of the Executive Branch could inform the judgment of the Judiciary, but [do] not supersede it.").  Meanwhile, Petitioners' interpretation—that § 1226(a) is the governing authority and that they are not "applicants for admission—is not contrary to the statutory scheme of the INA.  *See generally* § 1226.  Nowhere in § 1226 is the phrase "applicants for admission," "admission," or "admitted" used in the context raised in § 1225.

Absent Congressional action that repeals and revises § 1226(a), the directive that the Attorney General must either continue to detain the noncitizen or release the noncitizen on bond or parole persists.  Respondents unacceptably collapse § 1226 into nonexistence under a wide-reaching interpretation of "applicants for admission."  [*See* MSJ Reply at 8 (arguing Respondents' view would render § 1226(a) meaningless in despite a recent legislative amendment)].

Where statutory language is unambiguous and "the statutory scheme is coherent and consistent," the Court must end its inquiry.  *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 240 (1989).  Because the Court finds the

---

[11] The Court acknowledges certain other district courts disagree with this Court's interpretation. *Barrios Sandoval v. Acuna, et al.*, No. 6:25-CV-01467, 2025 WL 3048926 (W.D. La. Oct. 31, 2025) (holding that the "plain text" of § 1225(a)(1) includes "any [noncitizen] physically present in the United States who has not been admitted"). *Cirrus Rojas v. Olson, et al.*, No. 25-CV-1437-BHL, 2025 WL 3033967 (E.D. Wis. Oct. 30, 2025) (same); *Vargas Lopez v. Trump*, No. 8:25CV526, 2025 WL 2780351 (D. Neb. Sept. 30, 2025) (same). *See also Chavez v. Noem*, No. 3:25-CV-02325-CAB-SBC, 2025 WL 2730228 (S.D. Cal. Sept. 24, 2025) (denying a preliminary injunction on those grounds).

statutory provisions to be unambiguous and consistent with only Petitioners' interpretation, there is no need to engage with canons of construction, legislative history and intent, implementing regulations, or agency practice.  [*See* MSJ at 32–42; MSJ Opp. at 25–29].[12]

Accordingly, the Court **GRANTS** Petitioners' Motion for Partial Summary Judgment.  In determining that only Petitioners' interpretation can be correct, the Court declares Respondents' interpretation contrary to law.  As such, the interpretation in *Yajure-Hurtado*, 29 I. & N. Dec. 216, which contradicts the Court's reasoning is no longer controlling.  *See Loper Bright*, 603 U.S. at 398–99 (requiring courts "to *ignore*, not follow, 'the reading the court would have reached' had it exercised its independent judgment).

The next section discusses the relief accompanying the declaration that the DHS Policy is unlawful.

### 4.    Corresponding Relief to Summary Judgment

In their Opposition to the Reconsideration Application, Respondents raised jurisdictional questions regarding the availability of APA review.  [Opp. to App. at 11].  Before detailing the relief to which Petitioners are entitled for their APA claim (Count III of the Amended Class Complaint), the Court addresses the jurisdictional issues and how Petitioners may bring their APA claim.

Respondents suggest that APA review is unavailable to Petitioners because "[h]abeas is an adequate alternative remedy" and therefore "displaces APA review."  [Opp. to App. at 10–11].  Petitioners respond that they "brought their class claims under the APA, and not habeas, because they do not seek class members' release."  [Reply to App. at 7].  The Reply insists that the Amended Class Complaint seeks to "challenge agency policies unlawfully interpreting the statutes to deprive [Petitioners and the Bond Eligible Class] of access to bond hearings."  [*Id.*].[13]

---

[12] Even if the Court were to consider the parties' alternative arguments, Petitioners' interpretation still presents more meritorious arguments.  *See Rodriguez v. Bostock*, 2025 WL 2782499 at *21–26 (considering arguments regarding canons of construction, legislative history, and agency practice and concluding the same).

[13] The Amended Class Complaint indeed includes APA claims challenging the legality of agency policies that interpret the INA.  [ACC at 6, 17].

Perhaps that is the case; however, Petitioners do not address *how* APA review is available under 5 U.S.C. § 704.  Petitioners merely dispute Respondents are incorrect in demanding their claims be brought in habeas.

The Opposition to the Reconsideration Application cites to *O'Banion v. Matevousian* and *Monk v. Sec'y of Navy*.  *O'Banion*, 835 F. App'x 347 (10th Cir. 2020); *Monk*, 793 F.2d 364 (D.C. Cir. 1986).  [*Id.* at 11].  Both cases raised in the Opposition are unavailing.  As a preliminary matter, *Monk*'s relevance to this issue is dubious.

*Monk* makes no mention of any APA claims and only discusses challenges to custodial release by prisoners.  *Monk*, 793 F.2d at 366.  Further, *O'Banion*'s discussion relating to the APA claim focuses on how the instant habeas corpus actions provided an "adequate forum to review" for Inmate Financial Responsibility Program ("IFRP") claims specifically.  *O'Banion v. Matevousian,* No. 19-CV-02868-LTB-GPG, 2019 WL 8886176 at *2 (D. Colo. Nov. 15, 2019) (containing the reasoning adopted by the Tenth Circuit).

True, *O'Banion* held that the petitioner in that case could not bring an APA claim because he "[did not] identify any statute authorizing review of [the relevant actions] . . . and . . . that habeas actions under [§ 2241] . . . provide an adequate remedy to review alleged abuses of the IFRP."  835 F. App'x at 350.  But *O'Banion* does not hold universally that habeas actions displace APA review under § 704, as the Opposition seems to suggest.  [Opp. to App. at 11].  Nor does it speak to the INA at all.

Instead, the Court returns to Respondents' contention regarding § 704. [Opp. to App. at 10–11].  The APA provides only "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court, are subject to judicial review."  § 704.

The Court could resolve the dispute regarding the availability of APA review on the first part of § 704.  Arguably, the statutes that make the DHS Policy reviewable under § 704 are § 1226 and § 1252.[14]  *See Arce v. United States*, 899

---

[14] Cases that have foreclosed judicial review to claims brought under the INA with regard to § 704 all cite to a specific *limit* or *revocation* of jurisdiction in § 1252.  *See e.g.*, *Dubey v. Dep't of Homeland Sec.*, 154 F.4th 534, 537 (7th Cir. 2025) (finding the APA does not authorize judicial review where § 1252(a)(2)(A)(i) strips courts of jurisdiction to review claims arising from or relating to the

F.3d 796, 801 (9th Cir. 2018) (per curiam) (opting to abide by the "general rule to
resolve any ambiguities in a jurisdiction-stripping statute in favor of the narrower
interpretation" and the "strong presumption in favor of judicial review").
Although both of these statutes contain some limits to a court's ability to review
certain actions, none of those restrictions are implicated in this case.  Taking
§ 1226 and § 1252 as the statutory source for judicial review, review under § 704 is
available to Petitioners.

Yet, even if the Court were to consider the availability of APA review based
on the availability of an adequate remedy over a final agency action, the Court
reaches the same result.

Respondents essentially argue that Petitioners' claims can *only* be brought
through habeas.  Not so.  "APA and habeas review may coexist."  *R.I.L-R v.
Johnson*, 80 F. Supp. 3d 164, 185 (D.D.C. 2015); *J.G.G. v. Trump*, 772 F. Supp. 3d
18, 31 (D.D.C. 2025) (noting the APA has "long been available to plaintiffs . . . .
even in immigration challenges where habeas is also available"); *see also Abrego
Garcia v. Noem*, 777 F. Supp. 3d 501, 510 n.10 (D. Md. 2025) (indicating that
habeas claims need not be brought to the exclusion of all other claims in certain
contexts); *Valez-Chavez v. McHenry*, 549 F. Supp. 3d 300, 305 (S.D.N.Y. 2021)
(recognizing the same); *Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 140 (D.D.C.
2018) (permitting plaintiffs to proceed with their APA claim alleging DHS's
violations of the INA); *cf. Castaneda v. Garland*, 562 F.Supp.3d 545, 559–61
(C.D. Cal. 2021) (finding subject-matter jurisdiction and permitting a detained
noncitizen to proceed with APA claims).

In particular, *Valez-Chavez* adopted the reasoning of *R.I.L-R* regarding the
coexistence of APA and habeas review because "[n]othing in the text of the writ of

---

implementation or operation of removal determinations under § 1225(b)(1));
*Britkovyy v. Mayorkas*, 60 F.4th 1024, 1027 (7th Cir. 2023) (holding
§ 1252(a)(2)(B)(i) precludes APA challenges of adjustment-of-status application
denials); *Gao v. U.S. Dep't of Homeland Sec.*, No. 21-CV-03253-CBM-GJSx, 2022
WL 2903126 (C.D. Cal. June 15, 2022) (same); *Akpojiyovwi v. Acosta*, No. CIV.
H-04-3495, 2005 WL 1668133 (S.D. Tex. July 15, 2005) (same); *Orabi v. Chertoff*,
562 F. Supp. 2d 1377 (N.D. Ga. 2007) (same).  The Court is unaware of any cases
that have expressly precluded APA review of claims like those brought by
Petitioners in the Amended Class Complaint.  Therefore, APA review is available
to Petitioners as to the non-habeas class claims.

habeas corpus, or the legislative history relied on by the government, demonstrates the customization or exclusivity needed to prove, by clear and convincing evidence, that Congress created the writ as a special and adequate review procedure within the meaning of § 704." *Valez-Chavez*, 549 F. Supp. at 306; *see also Citizens for Resp. & Ethics in Washington v. United States Dep't of Just.*, 846 F.3d 1235, 1244 (D.C. Cir. 2017) (requiring clear and convincing evidence of legislative intent to create a special, alternative remedy to bar APA review). The Court joins these courts in finding these claims may coexist. There is no exclusivity of habeas claims that bars the availability of APA review where § 1252(f)'s restrictions do not apply.

The Court also notes Respondents' argument that habeas is an adequate remedy seems to misunderstand Petitioners' requested clarification and relief to sound only in habeas. [Opp. to App. at 7–8]. To the extent Respondents' take issue with Petitioners' habeas claims, the available relief is limited to the named Petitioners who were detained and denied individual bond hearings in violation of the INA.

If Petitioners had requested classwide declaratory habeas relief, such relief could extend only to members of the Bond Eligible Class residing within this judicial district. *See Rumsfeld v. Padilla*, 542 U.S. 426, 443 (2004) (concluding habeas jurisdiction lie "in only one district: the district of confinement"). Therefore, all other members of the Bond Eligible Class would not be afforded relief under habeas. Indeed, that was the nature of this action anyway. The Amended Class Complaint and briefings from Petitioners confirm that habeas relief was sought only as to the named Petitioners. [ACC at 7, 34–35; Dkt. No. 42 at 36, 42]. Nowhere in the Amended Class Complaint or Motion for Partial Summary Judgment do Petitioners seek *habeas relief* on a nationwide level. [ACC at 34 (requesting habeas relief for named Petitioners only); Dkt. No. 42 at 36, 42 (same)].

However, if Respondents contest the availability of APA review by suggesting habeas is an adequate remedy, the Court concludes habeas relief is inadequate because it offers only "doubtful and limited relief." *See Bowen v. Massachusetts*, 487 U.S. 879, 901 (1988).

Although it is true that habeas actions may provide an adequate remedy in certain cases, that is not the case here. This is where Petitioners' APA claims fill the remedial gap. In addition to the habeas relief, Petitioners brought their APA

claims in a representative capacity for a nationwide Bond Eligible Class.  APA
relief, unlike habeas relief, provides a complete remedy because relief would take
form through vacatur of the very policy that Respondents rely on in violating the
rights of Petitioners and members of the Bond Eligible Class.  [*See generally*
Reconsideration App. at 8–9].

Based on the record before the Court, Petitioners' APA and habeas claims
must be permitted to coexist because they reach separate issues, and request
distinct relief, despite relying on the same underlying premise that the DHS Policy
is unlawful.  [*See* Reply to App. at 7–8 (citing *R.I.L-R*, 80 F. Supp. 3d 185–86
(indicating Congress has never, unlike it has toward individual deportation and
exclusion orders, "manifested an intent to require those challenging an unlawful,
nationwide detention policy to seek relief through habeas rather than the APA")].

Because no bar to APA review exists, Petitioners may proceed with its APA
claims challenging the legality of the DHS Policy and seek relief under § 706(2).
[*See id.* at 8].  In light of the discussion above, the Court now details what relief
Petitioners are entitled to for their APA claim.

### 5.    Vacatur under the APA

Section 706(2)(A) of the APA commands a reviewing court to "hold
unlawful *and set aside* agency action, findings, and conclusions" that are found to
be "arbitrary, capricious, . . . or otherwise not in accordance with law."
§ 706(2)(A) (emphasis added).

The discussion above finds the statutory language of the INA unambiguous
and the statutory scheme coherent and consistent.  The corollary of such finding, in
line with the APA's command upon reviewing courts, is that the DHS Policy be set
aside as not in accordance with law.

Respondents question whether vacatur relief is appropriate given
§ 1252(f)(1)'s prohibition on certain judicial actions.  [Opp. to App. at 11].  The
Opposition suggests the Court should "decline the request to hurriedly enter
vacatur relief without the full benefit of briefing on the issue."  [*Id.* at 11–12].

True, the parties may have not sufficiently briefed the issue of whether
§ 1252(f)(1) prohibits vacatur as a form of relief.  However, the choice to provide
scant briefing on the APA lies with Respondents, who were on notice that the APA
claims were well within the scope of the Motion for Partial Summary Judgment,
and that Petitioners sought vacatur as the form of relief.

Within the Motion for Partial Summary Judgment, Petitioners mentioned expressly on multiple occasions that they were raising arguments as to their APA claim. [MSJ at 14–15, 36, 41; *see also id.* at 23–35 (arguing implicitly the unlawfulness of Respondents' actions under § 706(2) of the APA)]. Moreover, the Proposed Order accompanying the Motion for Partial Summary Judgment explicitly contemplates vacatur under the APA. [Dkt. No. 42-1 at 3].

Despite this, Respondents never responded to or opposed Petitioners' arguments on APA vacatur in both the Motion for Partial Summary Judgment and Motion for Class Certification. Respondents could, and should, have presented such arguments at least in the context of summary judgment briefing. Petitioners even made argument requesting vacatur at the hearing before the Court on November 14, 2025. [Dkt. No. 84, at 44:16–45:6, "Transcript of Hearing"]. Respondents never raised any argument in opposition at the hearing despite being presented the opportunity. [*Id.* at 45:22–55:10 (providing Respondents with an opportunity to address Petitioners' arguments after the mention of vacatur as a requested remedy)]. Failure to respond to the arguments when the issues were squarely at issue constitutes waiver by Respondents to their current arguments.[15]

Although Respondents did not have the benefit of the Court's ruling regarding the correct interpretation of the INA, at the very least, Respondents were on notice of the Court's ruling in the TRO that Respondents' policy was contrary to law when they submitted briefings regarding the Partial Summary Judgment and Class Certification Motions. [*See* TRO Order]. Nevertheless, Respondents chose to rely heavily on their jurisdiction-based arguments rather than address the APA claim in the alternative, should the Court have found their interpretation incorrect. Respondents cannot now advance the argument that Petitioners' APA claim and

---

[15] The Court recognizes that other cases have considered arguments regarding whether § 1252(f)(1) is jurisdictional or can be waived. *See Castanon-Nava v. U.S. Dep't of Homeland Sec.*, No. 25-3050, 2025 WL 3552514 (7th Cir. Dec. 11, 2025) (observing that the Supreme Court held that § 1252(f)(1) does not limit subject matter jurisdiction and citing to other authority suggesting arguments as to § 1252(f) are waivable); *see also Biden v. Texas*, 597 U.S. 785, 798 (2022) (clarifying § 1252(f)(1) withdraws a district court's 'jurisdiction or authority' to grant a particular form of relief but not "of all subject matter jurisdiction over claims brought under . . . the INA"); *see id.* at 838–40 (Barrett, J., joined by Thomas, Alito, Gorsuch, JJ., dissenting) (questioning whether § 1252(f)(1) is jurisdictional).

request for vacatur pursuant to the APA is outside the scope of that motion or the Court's ruling.  A prudent attorney would have proactively addressed all possible outcomes of the Court's decision.

Logic necessarily implicates one of Petitioners' APA claims based on the arguments raised in the Motion for Partial Summary Judgment.[16]  Section 706(2)(A) of the APA commands a reviewing court to "hold unlawful *and set aside* agency action, findings, and conclusions" that are found to be "arbitrary, capricious, . . . or otherwise not in accordance with law." § 706(2)(A) (emphasis added).  The only possible outcome following the Court's interpretive determination regarding the INA is vacatur under the APA.

The Court does not intend to minimize Respondents' crucial point that the Court cannot "transform non-coercive declaratory relief into coercive injunctive relief" because Congress expressly foreclosed the latter through § 1252(f)(1). [Opp. to App. at 8].  However, even if the Court were to consider Respondents' argument that vacatur would be contrary to § 1252(f)(1), the Court would reach the same decision for three different reasons.

### i.    The Textual Account

*First*, as a textual matter, § 1252(f)(1) bars injunctive relief, not vacatur. Nowhere in § 1252(f) details any prohibition of vacatur.  No part of the INA even mentions vacatur, let alone its availability or lack thereof of this specific remedy.[17] Yet some portions of the INA contemplate the ability of courts to "set aside" actions while others conversely restrict courts from setting aside certain actions. Most pertinent here is § 1226(e)'s limit on judicial review in the Attorney General's discretionary judgment regarding the application of this action.  That statutory language prohibits courts from setting aside "any action or decision by

---

[16] No part of this discussion extends to Petitioners' APA claim on Respondents' failure to observe required procedures: Count IV of the Amended Class Complaint.  [ACC at 31–32].  Petitioners did not include Count IV within the scope of the Motion for Partial Summary Judgment and do not seek to include it in the Application.

[17] The Court's review of the entirety of 8 U.S.C. §§ 1151–1382 reveals only one instance of the use of "vacated," which is found in § 1182(n)(5)(D)(ii). However, the context of this provision makes clear it refers to vacating awards of an arbitrator, which has no relevance here.

the Attorney General under this section regarding the detention of any [noncitizen] or the revocation or denial of bond or parole."

But as the Ninth Circuit has found, § 1226(a) and its implementing regulations confer "extensive procedural protections . . . including several layers of review of the agency's initial custody determination, an initial bond hearing before a neutral decisionmaker, the opportunity to be represented by counsel and to present evidence, the right to appeal, and the right to seek a new hearing when circumstances materially change." *Rodriguez Diaz v. Garland*, 53 F.4th 1189 (9th Cir. 2022) (citing § 1226(a)(1)–(2); 8 C.F.R §§ 236.1, 1003.19(b)).  Because § 1226(e) only restricts courts' ability to set aside actions or decisions by the Attorney General that are discretionary, the issues raised in this case fall outside of its scope. *See Avilez v. Garland*, 69 F.4th 525, 530 (9th Cir. 2023) (determining the federal regulations for § 1226(a) entitle noncitizens to a bond hearing on a statutory level).

Although the outcome of the bond determination is discretionary, providing a bond determination in the first instance is not.  Therefore, neither § 1226(e) nor § 1252(f)(1) bars this Court from issuing vacatur as a form of relief.

Moreover, the APA contemplates the availability of vacatur as a form of relief against agency actions in a manner separate from injunctive relief.  Section 706 provides that a reviewing court *shall* "compel agency action unlawfully withheld" *and* "hold unlawful and set aside agency action . . . found to be . . . not in accordance with law."  § 706(1), (2)(A).

There are two important and interrelated observations to make here.  The first: the APA considers compelling agency action to be separate from setting aside agency action.  The text of § 706 separates these two forms of judicial action in separate subsections, recognizing that requiring that an agency does something is different from setting aside agency action.  Second: compelling agency action under § 706(1) is akin to an injunction, which falls within the ambit of § 1252(f)(1)'s prohibition on injunctive relief.  But where compelling agency action and setting aside agency action must be considered separate, § 1252(f)(1)'s prohibition does not reach § 706(2)(A).  Viewing § 706 and § 1252(f)(1) together, the Court finds vacatur under the APA is lawful in these circumstances.

Indeed, other courts have made similar observations.  The Fifth Circuit has held that "[t]here are meaningful differences between an injunction, which is a 'drastic and extraordinary remedy,' and vacatur, which 'is a less drastic remedy.'"

*Texas v. United States*, 40 F.4th 205, 219 (5th Cir. 2022) (citing *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010)); *see N.S. v. Dixon*, 141 F.4th 279, 290 n.7 (D.C. Cir. 2025) (referencing the Fifth Circuit's review that § 1252(f)(1) does not bar vacatur under the APA).  Some district courts have embraced the Fifth Circuit's view.  *See Coal. for Humane Immigrant Rts. v. Noem*, No. 25-CV-872-JMC, 2025 WL 2192986 (D.D.C. Aug. 1, 2025) (adopting the view that § 1252(f)(1) does not bar vacatur under APA § 706); *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, 793 F. Supp. 3d 19, 61 (D.D.C. 2025) (characterizing the government's argument that vacatur is unavailable under § 1252(f)(1) as meritless); *Nat'l TPS All. v. Noem*, 773 F. Supp. 3d 807, 866–68 (N.D. Cal. 2025) (differentiating vacatur from injunctive relief and finding vacatur appropriate), *aff'd*, 150 F.4th 1000 (9th Cir. 2025).

Courts do not do so ignorant of the implications of vacatur.  *See Action on Smoking & Health v. Civ. Aero. Bd.*, 713 F.2d 795, 797 (D.C. Cir. 1983) ("To 'vacate,' as the parties should well know, means 'to annul; to cancel or rescind; to declare, to make, or to render, void; to defeat; to deprive of force; to make of no authority or validity; to set aside.'"); *Nat'l TPS All.*, 773 F. Supp. 3d at 866–67; *CASA, Inc. v. Noem*, 792 F. Supp. 3d 576, 596 (D. Md. 2025) (citing authorities distinguishing vacatur from injunctions); *Kidd v. Mayorkas*, 734 F. Supp. 3d 967, 987 (C.D. Cal. 2024) (finding  vacatur appropriate and a "less drastic remedy" than injunctive relief).  As one district court has stated, "any indirect impact that vacatur . . . might have on how DHS exercises its authority under part IV of the INA does not equate to the Court having [enjoined or restrained] operation of that part."  *Fla. v. United States*, 660 F. Supp. 3d 1239, 1285 (N.D. Fla. 2023).

Another judicial district has expressly held vacatur under the APA "does not 'enjoin or restrain the operation of' [§ 1226]."  *Texas v. United States*, No. 6:21-CV-00016, 2022 WL 2720155 at *2 (S.D. Tex. June 14, 2022).

To emphasize, vacatur is not injunctive relief.  Although it has since declined to weigh in on this issue, the Supreme Court did affirm vacatur of DHS's recission of the Deferred Action for Childhood Arrivals program in *Dep't of Homeland Sec. v. Regents of the Univ. of California.  See* 591 U.S. 1, 34–35 (2020); *see also United States v. Texas*, 599 U.S. 670, 690–91 (2023) (discussing vacatur only in the concurring and dissenting opinions).

Although Justice Gorsuch has articulated concerns involving Article III redressability about vacatur orders, this Court respectfully disagrees.  *See  United*

*States v. Texas*, 599 U.S. at 691 (Gorsuch, J. concurring). Vacatur operates much like declaratory relief, which can satisfy Article III redressability. Declaratory relief provides parties with a "definite statement of their legal relations as a way to order their affairs." James E. Pfander, *The Past and Future of Procedure Scholarship*, 169 U. Pa. L. Rev. 2495, 2499 (2021). The same is for vacatur.

Justice Gorsuch raises doubts regarding the redress afforded by a judicial decree rendering certain agency action a nullity if it does not change how federal officials may act. 599 U.S. at 691 (Gorsuch, J. concurring). But much like declaratory relief, vacatur "may be persuasive but is not ultimately coercive." *Steffel v. Thompson*, 415 U.S. 452, 471 (1974).

Start with the premise that declaratory relief allows a party to understand one's "perceived legal entitlements." Pfander, *The Past and Future of Procedure Scholarship*, at 2500. Vacatur goes further. Upon a court's final judgment ordering vacatur, an agency is supposed to remove the vacated rule or order from the Code of Federal Regulations. *See* Adoption of Recommendations and Statement Regarding Administrative Practice and Procedure—Administrative Conference Recommendation 2013-6: Remand Without Vacatur, 78 Fed. Reg. 76,269, 76,272, 76,273 (Dec. 17, 2013) ("Agencies should . . . work with the Office of the Federal Register to remove the vacated regulation from the Code of Federal Regulations."). What follows then is that vacatur provides a tangible remedy through a federal court's judgment when it carries such a close relationship to the injury suffered. In this case, vacatur would nullify the originating source of the agency's unlawful conduct, and it does so without directly interfering with the enforcement of contested statutes or ordinances. In fact, vacatur would not restrain but facilitate the operation of § 1226(a), which has arguably not operated since the DHS Policy went into effect (legally or illegally[18]); § 1225's operations are not

---

[18] Justice Alito's opinion in *Garland v. Aleman Gonzalez* held that § 1252(f)(1)'s use of the phrase "operation of" refers not to operations of the law as properly interpreted but includes unlawful or improper operations as well. 596 U.S. 543, 552 (2022). Even accepting this premise, "'operation of' (a thing) means the functioning of or working of (that thing)." *Id.* at 549. Because the record reflects that Respondents no longer engage in the operation of § 1226(a) due to their new interpretation of "applicants for admission," vacatur would not interfere with any present operation of the law. [Dkt. No. 5-2 at 44–46 (indicating ICE "will not issue Form I-286, *Notice of Custody Determination*" and "ERO will affirmatively cancel the Form I-286")].

affected, as it still retains the same force and effect of law as well as ability to operate without the DHS Policy.

Therefore, including vacatur as a form of relief in the judgment would satisfy Article III redressability. *See Haaland v. Brackeen*, 599 U.S. 255, 294 (2023) (indicating that the judgment, not the opinion, of the court remedies an injury and thus demonstrates redressability). This is possible even though vacatur lacks the coercive or restraining character of an injunction.

Justice Gorsuch further expresses his skepticism that the APA authorizes vacatur given the text of § 706(2) containing no mention of "vacatur" but only an authorization to "set aside" agency action. 599 U.S. at 695 (Gorsuch, J. concurring). For one, this Court believes the synonymous nature of "vacate" and "set aside" would weigh in favor of finding the availability of this relief.[19] But as Justice Alito also indicates, to accept Justice Gorsuch's argument would result in "a sea change in administrative law as currently practiced in the lower courts." *Id.* at 721 (Alito, J., dissenting).[20] Vacatur of agency practices and policies contrary to the law has long been granted, suggesting the textual absence of the term "vacatur" is immaterial to its availability. This relates closely to the Court's second reason for concluding vacatur is an available remedy in the face of § 1252(f)(1).

### ii.    Judicial Precedent

*Second*, courts across the country have consistently granted vacatur as a form of relief in spite of § 1252(f). Most recently, the Ninth Circuit has affirmed judgments of APA claims based in § 706(1), which "compel agency action unlawfully withheld or unreasonably delayed." *See Al Otro Lado v. Exec. Off. for Immigr. Rev.*, 138 F.4th 1102 (9th Cir. 2025), *cert. granted sub nom. Noem v. Al Otro Lado*, No. 25-5, 2025 WL 3198572 (U.S. Nov. 17, 2025); § 706(1); *see also*

---

[19] Mila Sohoni, *The Past and Future of Universal Vacatur*, 133 Yale L.J. 2305, 2374 (2024) ("The temptation of [this type of] approach is obvious; it is much simpler to 'ctrl-F' in the APA for the word 'vacatur' than it is to locate and digest old dictionaries, cognate statutes, transcripts of record, legislative history, and so forth.").

[20] It may be worth noting that Chief Justice John Roberts stated in the oral argument for *United States v. Texas* that it would be "fairly radical and inconsistent" with the "whole established practice under the APA" to preclude vacatur due to § 1252(f)(1). Transcript of Oral Argument at 35–36, *United States v. Texas*, 599 U.S. 670 (No. 22-58).

*Texas v. United States*, 50 F.4th 498, 530 (5th Cir. 2022) (finding no abuse of discretion in the district court's granting vacatur); *Texas v. United States*, 40 F.4th 205, 220 (5th Cir. 2022) (granting vacatur despite § 1252(f)(1) to "re-establish the status quo absent the unlawful agency action"); *A.C.R. v. Noem*, No. 25-CV-3962-EK-TAM, 2025 WL 3228840 at *8 (E.D.N.Y. Nov. 19, 2025) (holding § 1252(f)(1) does not bar eventual vacatur under the APA).

Although Respondents posit that "[i]t does not matter that Petitioners seek vacatur rather than an injunction," they cite no supporting authority for this specific point. Respondents only seek to equate vacatur with injunctive relief by invoking *Garland v. Aleman Gonzalez*. 596 U.S. 543 (2022). As Respondents suggest, *Aleman Gonzalez* held that § 1252(f)(1) bars "class-wide injunctions that prohibit the Government from doing what the statutes allows or commands" as well as injunctions that prohibit unlawful government action. *Aleman Gonzalez*, 596 U.S. at 552–53. [*See* Opp. to App. at 11 (considering § 1225(b)(2) as falling within § 1252(f)(1)'s prohibition on orders restricting the government's efforts to enforce or implement specified statutory provisions)]. 596 U.S. at 552–53 (finding the jurisdictional limit applies "[r]egardless of the nature of the action or claim").

This Court, bound by Ninth Circuit precedent, must follow suit that § 1252(f)(1) does not extend to vacatur. *Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 990 (9th Cir. 2025) (adopting the Fifth Circuit's view that *Aleman Gonzalez* does not extend to vacatur); *see also Texas v. United States*, 50 F.4th 498, 528 (5th Cir. 2022) (concluding "§ 1252(f)(1) does not apply to vacatur" after mentioning *Aleman Gonzalez*).

If Petitioners' requested relief seeks to prohibit the Government from adhering to the DHS Policy adopted in July 2025, § 1252(f)(1) would surely bar the Court from granting that relief. However, this is not what Petitioners request. Instead, Petitioners seek vacatur of the DHS Policy.

The D.C. Circuit has also distinguished vacatur from injunction while discussing *Aleman Gonzalez*. *Make The Rd. New York v. Noem*, No. 25-5320, 2025 WL 3563313 at *17 (D.C. Cir. Nov. 22, 2025) (concurring with the Fifth Circuit). There is growing consensus that vacatur is an available remedy, albeit the issue is unsettled.

To gain the insight of academics, the discussion below further details why vacatur lacks the coercive aspects of injunctive relief and is not subject to § 1252(f)(1)'s restrictions on judicial remedies.

### iii.    Academic Accounts

The Court concurs with legal scholars who reason that vacatur is different in kind from injunction.

Vacatur is "distinct from injunctive relief in *several key respects*."  Hon. Kathryn Kimball Mizelle, *To Vacate or Not to Vacate: Some (Still) Unanswered Questions in the APA Vacatur Debate*, 2023 Harv. J.L. & Pub. Poly Per Curiam 1, 19 (2023); *see also* John Harrison, *Vacatur of Rules Under the Administrative Procedure Act*, 40 Yale J. on Reg. Bull. 119, 120 (2023) (distinguishing vacatur from injunction).

Under the APA, vacatur is "a unique form of judicial review that differs from the judicial review of statutes."  Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 950 (2018).  It allows courts to "formally revoke an agency's rules, order, findings, or conclusion . . . in the same way an appellate court formally revokes an erroneous trial-court judgment."  *Id.* at 1012.  Or, as Professor Harrison would have it, vacatur "affects the regulation itself," while injunction can forbid enforcement against the plaintiff only, or against anyone, party or not.  Harrison*, Vacatur of Rules Under the Administrative Procedure Act*, at 122.

Take for instance the effect of vacatur.  Professor Ronald M. Levin juxtaposes injunction from vacatur in how it dictates the conduct of the party against which the remedy is ordered.  *See* Ronald M. Levin, *Vacatur, Nationwide Injunctions, and the Evolving APA*, 98 Notre Dame L. Rev. 1997, 1999 (2023). Professor Levin defines vacatur as "a judicial order declaring that the rule shall no longer have legal effect."  *Id.*  This is "technically distinct, because an injunction *binds* the defendant and is enforceable through contempt."  *Id.*  Vacatur, instead, binds only the agency to which it is directed."  *Id.*  Professor John Harrison similarly notes that "[i]njunctions . . . operate on the defendant by imposing a new duty."  John Harrison, *Vacatur of Rules Under the Administrative Procedure Act*, 40 Yale J. on Reg. Bull. 119, 119–20 (2023).  In contrast, vacatur causes a rule "to lose binding force."  *Id.* at 119.

Although Professor Levin does concede that these two remedies can have the same functional effects as a nationwide injunction, the Court notes that the technical difference here matters.  *See* Levin, *Vacatur, Nationwide Injunctions, and the Evolving APA*, at 1999.

For one, vacatur and injunction do not share the same requirements. *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156–58 (2010) (analyzing vacatur separately from injunctive relief). It is also considered "less drastic" than an injunction. *Id.* at 165. The Supreme Court has previously articulated two important presumptions that inform this Court's view that vacatur is available under the APA: the presumption that (1) there must be a "clear and manifest" intent by Congress to displace conflicting provisions of two statutes, and (2) the APA favors judicial review. *See Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018); *Sackett v. E.P.A.*, 566 U.S. 120, 128 (2012).

The Court, therefore, concludes the availability of vacatur as a remedy in spite of § 1252(f)(1)'s prohibition on injunctive relief. *See* Sohoni, *The Past and Future of Universal Vacatur*, at 2314 ("The power to vacate a rule is, in short, firmly rooted in the APA, as courts and litigants have long understood.").

As far back as *Marbury*, the Supreme Court has emphasized that where there is a right, there must be a remedy. *Marbury v. Madison*, 5 U.S. 137, 147 (1803) ("It is a settled and invariable principle, that every right, when withheld, must have a remedy, and every injury its proper redress."). For these reasons, the Court finds that vacatur does not run afoul of § 1252(f)(1) consistent with its discussion on class certification below. *See infra* Part IV.B.

### 6.    Relief Available to Petitioners

With Respondents' arguments unavailing, the Court clarifies that vacatur under the APA necessarily follows from granting the Motion for Partial Summary Judgment. In doing so, the Court briefly emphasizes the importance of the separation of powers.

The respective branches of government must operate within the confines of the Constitution and its separation of powers. This is not optional.

Congress, through enacting the APA, has allowed individuals like Petitioners to seek relief from policies that are contrary to law. Congress has permitted suits for individuals to vindicate their rights in face of unlawful agency policies.

The judiciary, under the Constitution, has no role in questioning the potential wisdom behind any legislative or executive policy prerogative or the political persuasions that may underlie the DHS Policy. The Court's job is to determine whether Respondents have in fact acted unlawfully and violated the rights of

Petitioners and the Bond Eligible Class and to merely follow the unambiguous directive from Congress as contained in the APA to set aside that unlawful act.

Here, the DHS has committed itself to a new policy to deprive noncitizens across the nation of statutorily conferred rights. To do so in spite of Congress's choice to legislate these rights is executive overreach. Yet, Respondents desire to go further here. Respondents seek to prevent judicial review and argue against remedies available under the APA. [*See generally* Opp. to App.].

Consider the course of action available to a reviewing court under the APA. Section 706(2) states that a reviewing court *shall* "compel agency action unlawfully withheld or unreasonably delayed" *and* "hold unlawful and set aside agency action . . . found to be . . . not in accordance with law." § 706(1); § 706(2)(A). A reviewing court "shall" do both of those things. Thus, the Court is not merely able to grant relief to aggrieved individuals; the Court is *required* to do so under the APA's statutory text.

The Court discussion that declares Respondents' policy regarding bond hearings to be not in accordance with law effectively satisfies the "hold unlawful" portion of § 706(2) of the APA. Then what follows? The APA would require the Court to "compel agency action unlawfully withheld" as well as "set aside agency action."

However, there are some conflicting directives from Congress in this case. The Court cannot *compel* agency action. It has been made abundantly clear that § 1252(f)(1) prohibits lower courts from granting classwide injunctive relief, and the Supreme Court's decision in *Trump v. CASA* has eliminated the existence of the universal preliminary injunction. *Trump v. CASA, Inc.*, 606 U.S. 831, 839 (2025) (finding federal courts do not have the equitable authority to issue universal injunctions). Therefore, injunction is unavailable—classwide or universal.

It may appear that Congress and the Supreme Court have inexorably tied all lower courts' hands. But perhaps not. Section 1252(f)(1) and *Trump v. CASA* rule out only classwide injunctions and universal injunctions. So, what remains?

Procedurally speaking, a class action granting declaratory relief.[21]
Remedially speaking, vacatur under the APA.  Petitioners here have satisfied Rule
23's requirements *and* requested vacatur as a form of relief.

The relief the Court can grant as mandated by the APA is to "set aside
agency action" that it finds not in accordance with law.  § 706(2)(A).  As discussed
above, that remedy is found in vacatur.  Vacatur necessarily follows from a
declaration that an agency policy is unlawful.  Thus, by granting Petitioners'
Motion for Partial Summary Judgment, the Court sets aside the DHS Policy as not
in accordance with law.

Under the confines of immigration law claims brought under the APA,
declaratory relief combined with vacatur is the only possible remedy available for
claims like Petitioners'.  Given Petitioners expressly request this relief, and
because the Court declares the DHS Policy unlawful, the Court must set aside the
DHS Policy.

As such, the Court **VACATES** the DHS Policy under the APA.

## B.    Motion for Class Certification

As a threshold matter, Respondents oppose class certification, arguing that
statutory limits preclude the requested method of relief.  [Class Cert. Opp. at 14–
15].  Respondents further challenge the propriety of class certification by arguing
that Petitioners cannot demonstrate commonality and typicality, and the proposed
class does not qualify for Rule 23(b)(2) relief.  [Class Cert. Opp. at 15–24].[22]

---

[21] This comes with the caveat that the declaratory relief does not "directly
interfere with enforcement of contested statutes or ordinances exception with
respect to the particular federal plaintiffs."  *Trump v. CASA*, 606 U.S. at 844.  The
Court also notes that the Ninth Circuit has found § 1252(f)(1) "does not affect
classwide declaratory relief."  *Rodriguez v. Marin,* 909 F.3d 252, 256 (9th Cir.
2018).  Per the discussion above, there is no *direct* interference posed by vacatur
here.

[22] The Opposition further contends that the Adelanto Class is redundant and
should not be certified.  [Class Cert. Opp. at 24].  Petitioners concede this
argument, and maintain that a nationwide Bond Eligible Class suffices.  [Class
Cert. Reply at 4 n.1].

### 1.    8 U.S.C. § 1252

Respondents suggest 8 U.S.C. § 1252(e)(1)(B) precludes class certification in this action.  [Class Cert. Opp. at 14].  Section 1252(e)(1)(B) limits judicial review by preventing courts from "certify[ing] a class under Rule 23 . . . in any action for which judicial review is authorized under a subsequent paragraph of this subsection."  § 1252(e)(1)(B).  Respondents are correct that § 1252(e)(3)(A) limits "[j]udicial review of determinations under section 1225(b) of this title and its implementation is available in an action instituted in the United States District Court for the District of Columbia," and limits challenges to the constitutionality of a section or regulation, or whether certain regulations, policies, or procedures are inconsistent with the INA or violates other laws.  [Class Cert. Opp. at 14–15].  *See* § 1252(e)(3)(A).  However, invoking § 1252(e)(1)(B) as a bar to relief is illusory.

Respondents' argument assumes that Petitioners "challenge an alleged new policy that all [noncitizens] who entered the United States without inspection are subject to mandatory detention under § 1225(b)(2)(A)."  [Class Cert. Opp. at 14].  However, as discussed above, Petitioners posit they are detained under § 1226 and are therefore entitled to receive bond hearings rather than remain in mandatory detention.  [MSJ Reply at 6].

Because the premise of Petitioners' claim is that the proper governing authority over their detention is § 1226 rather than § 1225, the Court does not find § 1252(e)(3)(A) prohibits this Court from ruling on this Class Certification Motion.

### 2.    Rule 23(a)

The Court now considers whether the proposed class meets the requirements of Rule 23(a).

#### i.    Numerosity

Numerosity is satisfied if "the class is so large that joinder of all members is impracticable."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998)).  Generally, courts find the numerosity requirement satisfied "when a class includes at least 40 members."  *Rannis v. Recchia*, 380 Fed. Appx. 646, 651 (9th Cir. 2010)).

Respondents do not dispute that Petitioners have satisfied numerosity.  [*See generally* Class Cert. Opp.].  The Court finds numerosity is satisfied given the factual circumstances surrounding the putative class members and geographic

---

scope of the proposed class.  [Class Cert. Motion at 28 (suggesting that "at a minimum there are thousands of Bond Eligible Class members")].

The Bond Eligible Class includes individuals that were detained following "Operation At Large," which entailed a 3,000 daily arrest quota of putative class members in Los Angeles, California.  [Class Cert. Motion at 27].  Where the Department of Homeland Security ("DHS") and Immigration and Customs Enforcement ("ICE") continue to increase immigration-related arrests in cities across the country, the Court finds that Petitioners have demonstrated by a preponderance of evidence that numerosity is satisfied.  [*See* Department of Homeland Security, *ICE Launches Operation Midway Blitz in Honor of Katie Abraham to Target Criminal Illegal [Noncitizens] Terrorizing Americans in Sanctuary Illinois* (Sept. 8, 2025) (documenting "Operation Midway Blitz" in Chicago, Illinois); Department of Homeland Security, *DHS Launches Operation Charlotte's Web to Target Criminal Illegal [Noncitizens] Terrorizing Americans in Charlotte, North Carolina* (Nov. 15, 2025) (indicating "surging resources for Operation Charlotte's Web in North Carolina")].

Based on data from the Executive Office of Immigration Review ("EOIR") and DHS's reports of its operations, the Court finds the Bond Eligible class satisfies the numerosity requirement.  [*See* Class Cert. Motion at 26–28].

### ii.    Commonality

The second Rule 23(a) requirement is commonality.  This prong requires "a plaintiff . . . show that 'there are questions of law or fact common to the class.'" *Dukes*, 564 U.S. at 349 (quoting Fed. R. Civ. Proc. 23(a)(2)).  The proposed class's claims must "depend upon a common contention."  *Id.*  And the common contention "must be of such a nature that it is capable of classwide resolution— which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Id.*  Accordingly, "what matters to class certification ... is not the raising of common questions— even in droves—but rather, the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation."  *Id.* at 350.

Commonality is "construed permissively."  *Hanlon*, 150 F.3d at 1019.  Thus, "[a]ll questions of fact and law need not be common to satisfy the rule."  *Id.*; *see also Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1029 (9th Cir. 2012) ("Where the circumstances of each particular class member vary but retain a

common core of factual or legal issues with the rest of the class, commonality exists").

Rather, the "standard is "readily met" when plaintiffs seek prospective relief "challeng[ing] a system-wide practice or policy that affects all of the putative class members." *Mansor*, 345 F.R.D. at 204. Indeed, the Ninth Circuit has held that "in a civil-rights suit . . . commonality is satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members." *Gonzalez*, 975 F.3d at 808 (citations omitted).

There is little question here that Petitioners seek declaratory relief to challenge a newly adopted DHS policy that affects all putative class members. [Class Cert. Motion at 28–32]. Nevertheless, Respondents argue the proposed class lacks commonality because there are "obvious differences between purported class members," which would require "different answers depending on individualized circumstances." [Class Cert. Opp. at 16].

However, the Court does not find the difference among putative class members so obvious. Although it is possible that individuals may have differing charges of inadmissibility when they are arrested, the deprivation of their right to a bond hearing is a common injury. Such common injury can be resolved in a single stroke upon the determination that the new DHS policy is in violation of their due process rights. *See Rodriguez v. Hayes*, 591 F.3d 1105 (9th Cir. 2010) (describing commonality as "look[ing] only for some shared legal issue or a common core of facts").

The Court has rejected Respondents' proposed interpretation of the INA, which subjected Petitioners and those similarly situated to mandatory detention. *See supra* Part IV.A. As a matter of law, Respondents' interpretation runs counter to the plain language of the INA, foundational principles of statutory interpretation, and the INA's statutory scheme. [*Id.*]. In other words, the interpretive consequences of Respondents' interpretation and corresponding agency practices stemming from that interpretation injure Petitioners and putative class members in a common manner.

Where the class definition outlines an adequate basis to define this kind of injury, the Court finds commonality has been satisfied.

### iii.    Typicality

The third requirement of Rule 23(a) is typicality.  "The claims of the representative party must be typical of the class claims." *Gonzalez*, 975 F.3d at 809 (citing Fed. R. Civ. P. 23(a)(3)).  "[R]epresentative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon*, 150 F.3d at 1020; *Schwartz v. Harp,* 108 F.R.D. 279, 282 (C.D.Cal.1985).  Typicality looks to "whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).

"Typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought." *Hanon*, 976 F.2d at 508.  Typicality is a "permissive standard," *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003), but class certification is inappropriate "if there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it." *Hanon*, 976 F.2d at 508.

Together, commonality and typicality "serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical" and whether the class representative's and class claims are "so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982)

Respondents contest typicality by suggesting that "half of [the named Petitioners] will be subject to mandatory detention if and when they apply for immigration benefits." [Class Cert. Opp. at 18].  But Petitioners and the putative class members face essentially identical factual circumstances that satisfy typicality.

Petitioners arrived in the United States without inspection. [Habeas Petition at 6 –7].  They were later arrested and detained at an ICE Processing Center and were denied bond hearings by an IJ, who claimed a lack of jurisdiction. [*See id.*; TRO App.].  At the time of their arrest, Petitioners were charged inadmissible under grounds that did not place them under mandatory detention as required by § 1225(b)(1), § 1226(c), or § 1231. [Habeas Petition ¶¶ 43, 48, 53, 58].  Despite this, Petitioners remained in detention until the Court granted their TRO.  [*See*

TRO App.; TRO Order].  After the TRO, Petitioners were granted individualized
bond hearings.

A named plaintiff is not typical if "there is a danger that absent class
members will suffer if their representative is preoccupied with defenses unique to
it."  *DZ Rsrv. v. Meta Platforms, Inc.*, 96 F.4th 1223, 1238 (9th Cir. 2024).
Respondents posit that Petitioners cannot show typicality because "if and when
[named Petitioners] apply for a U-visa and cancellation of removal, respectively,
they will . . . be subject to mandatory detention under § 1225(b)(2)."  [Class Cert.
Opp. at 18].  Not only does the record fail to support the premise that Petitioners
will take such a course of action, but the Court also has doubts as to whether such
action would necessitate mandatory detention.  [*See* Class Cert. Reply at 7].

Much like the Petitioners, putative class members are noncitizens who
already arrived in the United States without inspection, or will enter the United
States and not face inspection.  [Class Cert. Motion at 14].  In other words, putative
class members are inadmissible, but not subject to mandatory detention under
§ 1225(b)(1), § 1226(c), or § 1231.  Where those individuals are subject to
mandatory detention due to Respondents' improper interpretation of the INA,
Petitioners' claims present the same circumstances as those of the Bond Eligible
Class.  Therefore, Petitioners' claims can be considered typical of Bond Eligible
Class's.

The Court thus finds that Petitioners have satisfied the typicality requirement
for the Bond Eligible Class.

### iv.      Adequacy

The final requirement of Rule 23(a) is adequacy.  Adequacy looks at
whether "the representative parties will fairly and adequately protect the interests
of the class."  *See Hanlon*, 150 F.3d at 1020 (quoting Fed. R. Civ. P. 23(a)(4)).  To
evaluate adequacy, the Court looks to whether (1) the named plaintiffs and their
counsel have any conflicts of interest with other class members and (2) whether
named plaintiffs and their counsel prosecute the action vigorously on behalf of the
class"  *See Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir.
1978)).  The named plaintiffs and their counsel must have "sufficient 'zeal and
competence' to protect the interests of the rest of the class."  *Doe v. Wolf*, 424 F.
Supp. 3d 1028, 1043 (S.D. Cal. 2020) (quoting *Fendler v. Westgate-Cal. Corp.*,
527 F.2d 1168, 1170 (9th Cir. 1975)).

Respondents do not appear to contest adequacy. Nevertheless, the Court evaluates whether there are any conflicts of interest or concerns associated with named Petitioners and their counsel.

### a.    Named Petitioner's Adequacy

The Court turns first to the adequacy of the named Plaintiff Petitioner: Lazaro Maldonado Bautista.

Bautista has lived in Los Angeles, California since 2021 and has no criminal history. [Dkt. No. 41-14 ¶¶ 3, 6, "Declaration of Lazaro Maldonado Bautista"]. He was arrested on June 6, 2025 during an ICE operation in Los Angeles, California. [Habeas Petition at 5–6]. Following his arrest, ICE detained Bautista at Adelanto ICE Processing Facility. [Declaration of Lazaro Maldonado Bautista ¶ 7]. Upon requesting a bond hearing before an immigration court, Bautista attended a hearing at which an IJ concluded that he was subject to mandatory detention and that the IJ lacked jurisdiction to consider his request for release on bond. [*Id.* ¶ 9]. Bautista, along with the other named Petitioners, received a bond hearing only after this Court granted their Application for a TRO. [*Id.* ¶ 12; *see also* TRO App.].

Having now been released on bond, Bautista expresses his interest in representing the class and his understanding of the responsibilities of doing so. In a declaration submitted to the Court, Bautista explains he "want[s] to be a named plaintiff in this case." [Declaration of Lazaro Maldonado Bautista at ¶ 13]. Furthermore, Bautista indicates his understanding that he "would represent a large number of people who have entered the United States without inspection" and "ICE is not considering [those people] for bond." [*Id.*]. The declaration further states he understands he "would represent people who are currently in detention and who have been denied consideration for bond for the same reason as [himself]." [*Id.* ¶ 14]. As part of his role as class representative, Bautista declares that his role would require representing "the interests of all class members in this lawsuit and that it is [his] responsibility to represent the interests of each class as a whole and not just [his] own personal interests." [*Id.* ¶ 15].

Based on his declaration, Bautista asserts that he is an adequate representative of the class; he seeks for the putative class members the same relief he received, and, as of the filing of the complaint, shares the same interests as absent class members. *See Doe v. Wolf*, 424 F. Supp. 3d 1028, 1043-44 (S.D. Cal. 2020). Nothing in the record suggests that Bautista has any conflicts of interest.

Bautista has a "mutual goal" with the other class members to challenge the allegedly unlawful practices and to "obtain declaratory . . . relief that would not only cure this illegality but remedy the injury suffered by all current and future class members." [Class Cert. Motion at 35 (quoting *Nightingale v. U.S. Citizenship & Immigr. Servs.*, 333 F.R.D. 449, 462 (N.D. Cal. 2019))].

The Court finds he is an adequate representative of the Bond Eligible Class.

### b.    Class Counsel's Adequacy

Counsel for the proposed class have shown that they have experience litigating class actions on immigration matters.  The two attorneys from the USC Gould School of Law Immigration Clinic—Mr. Niels W. Frenzen and Ms. Jean E. Reisz—have litigated and presented arguments in immigration cases in numerous federal district courts and represented clients in approximately fifty petitions before two Circuit Courts of Appeals.  [Dkt. 41-21 ¶¶ 2–4].  Moreover, the attorneys from the Northwest Immigrant Rights Project (NWIRP) have a decade or more of experience working in immigration law.  [*See* Dkt. No. 44-19 (explaining that Adams has many years of experience); *id.* ¶ 5 (explaining that Madrid has worked for NWIRP since 2013); *id.* ¶ 6 (explaining that Kang has worked for NWIRP since 2014); *id.* ¶ 7 (explaining that Korthius has worked for NWIRP since 2018).  Notably, Mr. Matt Adams has litigated "hundreds of cases and personally argued on behalf of immigrants before immigration judges, the Board of Immigration Appeals, federal district courts, the Ninth Circuit Court of Appeals, and the United States Supreme Court."  [Dkt. No. 41-19 ¶ 3].  He has "successfully moved for class certification and been approved by federal courts as class counsel in sixteen different class actions on behalf of immigrants."  [*Id.*].

Petitioners further detail the qualifications of My Khanh Ngo, Judy Rabinovitz, Michael K.T. Tan, and Noor Zafar of the ACLU Immigrants' Rights Project and Eva Bitran of the ACLU of Southern California, given their deep knowledge of immigration law and experience litigating class actions and complex federal cases.  [Class Cert. Motion at 35–36].  The combined experience of class counsel is more than adequate.

Finally, the Court finds nothing in the record to suggest that the attorneys have any conflicts of interest with other class members.  Accordingly, the Court concludes that counsel meet Rule 23(a)(4)'s adequacy requirement.

### 3.    Rule 23(b)(2)

Because the proposed class has met the requirements of Rule 23(a), the Court now turns to Rule 23(b). Petitioners seek class certification under Rule 23(b)(2), "which permits the Court to certify a class if 'the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.'" *Jane Doe 1 v. Nielsen*, 357 F. Supp. 3d 972, 991 (N.D. Cal. 2018).

The Ninth Circuit has previously concluded that "[n]either [Rule 23] nor due process necessarily requires that the district court rule on class certification before granting or denying a motion for summary judgment." *Wright v. Schock*, 742 F.2d 541, 545 (9th Cir. 1984). *See also Estakhrian v. Obenstine*, 859 F. App'x 121, 122 (9th Cir. 2021). As a preliminary matter, the Court has already determined that Respondents' interpretation of the INA cannot be squared with the statutory text and statutory scheme, and articulated the proper interpretation of the INA that applies to Petitioners. *See supra* IV III.A. The Court, therefore, makes clear that this proposed class is appropriate for certification under Rule 23(b)(2). However, for purposes of completeness, the Court addresses Respondents' concerns regarding certification and further articulates why Rule 23(b)(2)'s standards are met.

"Class certification under Rule 23(b)(2)" requires that "the primary relief sought is declaratory or injunctive." *Rodriguez v. Hayes*, 591 F.3d 1105, 1125 (9th Cir. 2010). Petitioners "seek declaratory relief and vacatur for [the Bond Eligible Class]." [Class Cert. Motion at 38]. Respondents raise two arguments to oppose class certification: (1) that § 1252(f)(1) prohibits the requested classwide relief, and (2) that the requested relief will not address the Bond Eligible Class's injuries as a whole. [Class Cert. Opp. at 19–23].

### 4.    Section 1252(f)'s Prohibition of Class Actions

The Ninth Circuit's recent decision in *Al Otro Lado v. Executive Office for Immigration Review* addresses Respondents' first argument. *See Al Otro Lado v. Exec. Off. for Immigr. Rev.*, 120 F.4th 606, 625–26 (9th Cir. 2024). In this case, the Ninth Circuit rejected the Government's argument that classwide declaratory relief was prohibited by § 1252(f). 120 F.4th at 1123–24. Nevertheless, Respondents insist that the requested declaratory relief would interfere with the Government's efforts to detain noncitizens under § 1225(b)(2), and that is

"impermissibly coercive." [Class Cert. Opp. at 20–21]. However, the Supreme
Court has acknowledged that a declaratory judgment, "[t]hough it may be
persuasive, . . . is not ultimately coercive." *Steffel v. Thompson*, 415 U.S. 452, 471
(1974).

The Court further notes that the statutory text further supports the
availability of classwide declaratory relief. *Compare* § 1252(e)(1)(A) (prohibiting
courts from entering "declaratory, injunctive, or other equitable relief" in any
action to exclude under § 1225(b)(1) *with* § 1252(f)(1) (specifically noting that this
subsection is a "[l]imit on injunctive relief"). Therefore, the requested relief for
the Bond Eligible Class authorized by Rule 23(b)(2) is not incompatible with
§ 1252(f). *See supra* Part IV.A.4–6 and IV.B.1 for further discussion.

### 5.      Whether Classwide Relief is Appropriate

Respondents next argue that classwide declaratory relief is not appropriate,
as "the relief sought would not be uniform and applicable to all class members."
[Class Cert. Opp. at 22]. Respondents suggest the class definition "draw[s] no
clear distinctions between [noncitizens] entering without inspection and
[noncitizens] present without inspection such that no single declaratory judgment
would cover all putative class members." [*Id.* at 22–23]. In other words,
Respondents take issue with an overbroad class definition, and further argue that
due process may call for dissimilar procedural protections. [*Id.*].

Despite being on notice of the Court's preliminary analysis of the merits in
the TRO Order, the Court recognizes that Respondents could not benefit from the
Court's reasoning from the MSJ Order at the time of submitting their Opposition.
However, the Court has now clarified two important concerns in this matter: (1)
that Respondents' interpretation of the INA is incorrect; and (2) the relief
requested by Petitioners would merely make available to Petitioners and putative
class members the statutory protections imbued by the INA. *See supra* Part IV.A.
The accessibility of the INA's statutory protections to noncitizens is therefore
uniform.

Rule 23(b)(2) "does not require [courts] to examine the viability or bases of
class members' claims for declaratory and injunctive relief, but only to look at
whether class members seek uniform relief from a practice applicable to all of
them." *Rodriguez v. Hayes*, 591 F.3d 1105, 1125 (9th Cir. 2010); *see also Parsons
v. Ryan*, 754 F.3d 657, 688 (9th Cir. 2014). This inquiry "does not require an
examination of the viability or bases of the class members' claims for relief, does

not require that the issues common to the class satisfy a Rule 23(b)(3)-like predominance test, and does not require a finding that all members of the class have suffered identical injuries.". *Parsons*, 754 F.3d at 688. Thus, "'it is sufficient' to meet the requirements of Rule 23(b)(2) that 'class members complain of a pattern or practice that is generally applicable to the class as a whole.'" *Rodriguez*, 591 at 1125 (citations omitted).

Consistent with the Court's reasoning above, the requested declaratory relief is generally applicable to all members of the Bond Eligible Class. According to Petitioners, the new DHS policy applies to the members of the proposed Bond Eligible Class. Where the DHS policy renders all of the Bond Eligible Class subject to mandatory detention under § 1225(b)(2), the putative class members have been deprived of their right to a bond hearing under § 1226(a). [Class Cert. Motion at 37–38]. The declaratory relief requested—a ruling that the policy violates Petitioners' and putative class members' statutory and constitutional rights—would provide the entire class with relief from continued deprivation of their rights. [*Id.* at 13, 38]. Petitioners explain that "[a] single declaratory judgment requiring [IJs] to provide individualized custody determinations at bond hearings" would apply to the class as a whole." [*Id.* at 38].

Crucially, a classwide order declaring the DHS policy in violation of the class members' rights would not ensure their release on bond; it merely secures a right to an individualized hearing. Any differences that may exist in class members' entitlement to be released is a different matter than their entitlement to a hearing. Respondents' concerns regarding uniform relief does not speak to the latter.

"The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the [defendant's] conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Dukes*, 564 U.S. at 360. The Court has already found Respondents' interpretation of the INA to be contrary to the statutory text and statutory scheme, and mutually exclusive of Petitioners' interpretation. Because the proper interpretation of the INA preserves a noncitizen's right to an individualized bond hearing after arrest, the reasoning by the Court as to the INA illustrates the indivisible nature of the relief. The Court finds similar cases from this judicial district instructive.

In *Franco-Gonzales v. Napolitano*, the Court found a class action under Rule 23(b)(2) was maintainable where the plaintiffs claimed that the defendants "[had] failed, on a systemic basis, to have adequate procedures in place to both identify mentally incompetent [noncitizens] and provide them with necessary safeguards." *Franco-Gonzales*, No. CV 10-02211 DMG DTBX, 2011 WL 11705815 (C.D. Cal. Nov. 21, 2011). Petitioners present very similar circumstances here. Respondents have failed, on a systemic basis, to provide Petitioners and putative class members with the necessary safeguards imbued by the INA in violation of their rights.

Moreover, in *Inland Empire-Immigrant Youth Collective v. Nielsen*, the Court found class certification under Rule 23(b)(2) was appropriate because "to certify a class that is *not* nationwide in scope might result in the application of unlawful practices based solely on geographic location, a piecemeal situation that would lead to arbitrary results." *Inland Empire-Immigrant Youth Collective v. Nielsen*, No. EDCV172048PSGSHKX, 2018 WL 1061408 at *12 (C.D. Cal. Feb. 26, 2018). With this in mind, the Court finds a nationwide Bond Eligible Class is appropriate.

Accordingly, Petitioners satisfy Rule 23(b)(2). The Court **GRANTS** Petitioners' Motion for Class Certification as to the Bond Eligible Class. The Court discusses below the applicable relief to class members.

### 6.    Limits to Classwide Relief

When considering class certification with the Court's reasoning as to the proper interpretation of the INA, the Court extends the same declaratory relief and vacatur granted to Petitioners to the Bond Eligible Class as a whole. This is not, however, an order by the Court to require Respondents to provide habeas relief for all class members across the nation.[23] Rather, it extends the declaration of the unlawful nature of the DHS Policy to the APA claim, which would thus require the Court to "set aside" that policy. Vacatur, then, would render the very DHS Policy

---

[23] Although Petitioners' Application merely requests that the Court declare class members are entitled to initial custody determination and custody redetermination hearings, it appears Respondents interpret this request as a court order requiring release from detention or bond hearings. [Dkt. No. 87-1 at 3]. If that is what Petitioners seek, the Court concurs with Respondents that any classwide orders to force government compliance would run afoul of § 1252(f)(1). [Opp. to App. at 9].

upon which immigration judges ("IJs") and the Executive Office for Immigration
Review have cited as grounds for its denial of bond hearings a nullity.

For purposes of clarity, the Court explains why habeas relief is limited.
Then, the Court explains why those limits do not apply to Petitioners' APA claim.
Although class relief is available in the habeas context, there are important
limitations to a Court's ability to grant such relief.

Respondents argue the Court cannot grant Petitioners' requested relief for
two reasons: (1) this Court's habeas jurisdiction is limited, and (2) the Supreme
Court has found this type of habeas litigation to be nonjusticiable.  [Opp. to App. at
6–8].[24]

The Court first discusses the limits to its subject-matter jurisdiction.

Respondents argue Petitioners ultimately request "habeas relief," which is
governed by the immediate custodian rule as well as jurisdictional rules that
require a habeas petition be filed within the district of confinement.  [Opp. to App.
at 7].  Respondents are correct about both rules, but they fail to acknowledge that
the certified class raises more than just habeas relief.

Although Petitioners requested habeas relief for the Named Plaintiffs,
Petitioners' requested classwide relief does not include ordering nationwide habeas
relief.  [Dkt. No. 41, "Class Certification Motion" at 30].  Instead, Petitioners'
Class Certification Motion articulated the capability of classwide resolution of the
legality of Respondents' policies through "at a minimum vacatur . . . and
declaratory judgments."  [*Id.*].

The Court readily admits that federal courts are of limited jurisdiction.  This
Court's jurisdiction to grant habeas relief is limited to those within the judicial
district.  *See Rumsfeld v. Padilla*, 542 U.S. 426, 443 (2004) (concluding habeas
jurisdiction lie "in only one district: the district of confinement").  In certifying the
Bond Eligible Class, the Court only extends its declaratory judgment regarding the
illegality of the DHS Policy for purposes of the APA claim.  The Court cannot

---

[24] To the extent Respondents seek to relitigate the merits of class
certification through its argument, the Court declines to consider these arguments.
[Opp. to App. at 6–9].  A motion for reconsideration may not be used as a vehicle
to renew arguments made in support of, or in opposition to, the original motion.
L.R. 7-18.

order nationwide release or bond hearings for Bond Eligible class members, especially so to those confined outside this judicial district.

It may be worth noting that the Court is aware that Respondents have transported noncitizens that may be members of the Bond Eligible Class across judicial districts. As a matter of course, this Court has issued orders against Respondents that prevent transfer of noncitizens who have filed habeas petitions, as it pertains to the Court's habeas jurisdiction. [*See e.g.*, Dkt. No. 12 in *Mena Enriquez v. Santacruz Jr.*, 2:25-CV-11649-SSS-BFM; Dkt. No. 8 in *Orduno v. Noem*, 5:25-CV-03332-SSS-BFM; Dkt. No. 8 in *Huerta Estrada v. Noem*, 5:25-CV-03271-SSS-BFM]. To the extent Petitioners seek habeas relief for class members in immigration detention outside of this judicial district, the Court reiterates such an action would be *ultra vires*; there is no habeas jurisdiction to do so.

Next, the Court analyzes Respondents' argument regarding justiciability. Respondents suggest "declaratory judgment in this action 'would not resolve the entire case . . . but would merely determine a collateral legal issue governing certain aspects of their pending or future suits." [Opp. to App. at 7 (citing *Calderon v. Ashmus*, 523 U.S. 740, 748 (1998))].

At first blush, Respondents' citation to *Calderon* seems to render the matter nonjusticiable. But a close look at *Calderon* reveals that those justiciability concerns are not present here. [*See* Reply to App. at 6].

Indeed, in *Calderon*, the Supreme Court found that litigants cannot seek declaratory judgment "to litigate a single issue in a dispute that must await another lawsuit for complete resolution." 523 U.S. at 748. But *Calderon* presents a distinguishable factual scenario. There, the plaintiff filed a class-action suit to resolve uncertainty over a narrow question of which of two California laws applied to him such that he might be entitled to appointment of counsel. *Id.* at 746. Because the plaintiff sought the declaratory relief to establish "the validity of a defense the State may, or may not raise, in a habeas proceeding," the Supreme Court determined such relief would not resolve a case or controversy. *Id.* at 747. Instead, it was merely an attempt "to gain a litigation advantage by obtaining an advance ruling on an affirmative defense." *Id.* Because the "case or controversy" at stake in the issue for the class was "their individual habeas proceedings," the Supreme Court stated "[a]ny judgment in this action thus would not resolve the entire case or controversy as to any one of them, but would merely determine a

collateral legal issue governing certain aspects of their pending or future suits." *Id.* The Declaratory Judgment Act bars such suits. *Id.* at 746.

But Chief Justice Rehnquist acknowledged in a unanimous opinion in *Calderon* that an action is a justiciable case or controversy when a determination of the parties' legal rights "afford[s] complete and adequate relief." *Id.* at 747; *see also id.* at 746 (requiring "final or conclusive determination" in a controversy).

The Court recognizes that *Calderon*, relying on *Coffman v. Breeze Corp.*, found that suits that piecemeal determinations of collateral issues are improper. *Calderon*, 523 U.S. at 747–49 (citing *Coffman v. Breeze Corp.*, 323 U.S. 316 (1945)). *Calderon* emphasized further that "[t]he disruptive effects of an action such as this are peculiarly great when the underlying claim must be adjudicated in a federal habeas proceeding." *Id.* at 747.

Two pertinent features of this action are distinguishable from how Respondents seek to apply *Calderon*. As the Court discussed above, Petitioners need not adjudicate all their claims in a federal habeas proceeding.[25] Further, even *Calderon* recognizes that in some instances, Article III "allows a declaratory judgment action to prevent interference with federal rights." *Id.* at 748–49 (referring to *Steffel v. Thompson*, 415 U.S. 452 (1974)).

*Steffel*, as detailed in *Calderon*, "completely resolved a concrete controversy susceptible to conclusive judicial determination." *Id.* at 749. Because there was an imminent threat of state criminal prosecution and the consequent deterrence of plaintiff's ability to exercise constitutionally protected rights, there existed a justiciable case or controversy. *Id.* (citing *Steffel*, 415 U.S. at 455–56).

*Calderon*, on the other hand, lacked several traits the Supreme Court determined were necessary to be a justiciable case under Article III. *Id.* The Supreme Court's discussion appears to consider a touchstone of justiciability that the defendant's conduct or assertions must have "coercive impact on the legal rights or obligations of either party." *See id.* (finding defendant's assertion on certain parts of California law lacked "coercive impact" on the parties' legal rights and obligations). Moreover, because there were anticipated subsequent lawsuits to be filed that would rely on the declaratory judgment issued in the dispute in

---

[25] *See supra* Part IV.B.6.

*Calderon*, the instant action would "not completely resolve those challenges, but would simply carve out one issue in the dispute for separate adjudication." *Id.*

Unlike *Calderon*, Petitioners are not bringing habeas claims only. And Petitioners' APA claim resembles the justiciable case in *Steffel*. Named Petitioners and other noncitizens already present in the United States face both an actual and imminent threat of indefinite detention due to the newly adopted DHS Policy. [*See generally* MSJ; *see generally* Reconsideration App.]. The DHS Policy consequently strips noncitizens in the Bond Eligible Class of their statutorily protected rights, a situation more actual than that of the protestors in *Steffel* who were told they would be arrested for handbilling in front of a shopping center. *See Steffel*, 415 U.S. at 455–56. In response, Petitioners in this case brought claims seeking to declare the DHS Policy unlawful, and further request by virtue of its illegality, to vacate the DHS Policy under the APA. [*See* Amended Class Complaint]. Vacatur, therefore, goes further than the nonjusticiable declaratory relief sought in *Calderon* due to its ability to conclusively set aside an unlawful policy. Coupling the declaratory judgment that the DHS Policy is unlawful with vacatur ensures this is not an impermissible advisory opinion. *See Public Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 242–43 (1952).

As such, all members of the Bond Eligible Class are entitled to relief in the form of declaratory relief, which declares the DHS Policy unlawful, and grants vacatur under the APA, which sets aside the DHS Policy.

## V.    PETITIONER'S REQUEST FOR FINAL JUDGMENT

Consistent with the Court's Clarification and Modification Order, the entry of final judgment will aid expeditious decision of the case. [*See* Clarification and Modification Order at 10–11]. The Court **ENTERS** final judgment as to Counts I, II, and III of the Amended Class Complaint. Counts IV and V of the Amended Class Complaint remain.

## VI.    CONCLUSION

Consistent with the discussion above, the Court **GRANTS** Petitioners' Motion for Partial Summary Judgment. [Dkt. No. 42]. In doing so, the Court finds the DHS Policy unlawful and **VACATES** the DHS Policy as contrary to law.

The Court further **GRANTS** Petitioners' Motion for Class Certification as to the Bond Eligible Class and **DENIES** as to the Adelanto Class. [Dkt. No. 41].

The Bond Eligible Class is **CERTIFIED** as to Petitioners' claims that the DHS Policy violates the INA and statutory Due Process. The class certified is defined as follows:

- **Bond Eligible Class:** All noncitizens in the United States without lawful status who (1) have entered or will enter the United States without inspection; (2) were not or will not be apprehended upon arrival; and (3) are not or will not be subject to detention under 8 U.S.C. § 1226(c), § 1225(b)(1), or § 1231 at the time the Department of Homeland Security makes an initial custody determination.

The Court appoints Lazaro Maldonado Bautista as the representative for the Bond Eligible Class. The Court appoints attorneys Niels W. Frenzen and Jean E. Reisz of the USC Gould School of Law Immigration Clinic; Matt Adams, Glenda M. Aldana Madrid, Leila Kang, and Aaron Korthuis of the Northwest Immigrant Rights Project; and My Khanh Ngo, Judy Rabinovitz, Michael K.T. Tan, and Noor Zafar of the ACLU Immigrants' Rights Project and Eva Bitran of the ACLU of Southern California as class counsel.

The final judgment will issue in a separate order. The Court **SETS** a status conference for **January 16, 2026, at 1:00 p.m.**, and **ORDERS** parties to submit a Joint Status Report on **January 9, 2026**, which shall include how the parties will proceed with this matter.

**IT IS SO ORDERED**.