UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—
GENERAL

| | | | |
|---|---|---|---|
| Case No. | 5:25-cv-01873-SSS-BFM | Date | February 18, 2026 |
| Title | *Lazaro Maldonado Bautista et al. v. Ernesto Santacruz Jr et al.* | | |

Present: The Honorable    SUNSHINE S. SYKES, UNITED STATES DISTRICT JUDGE

| Irene Vazquez | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:** **(IN CHAMBERS) ORDER GRANTING PLAINTIFF PETITIONERS' MOTION TO ENFORCE JUDGMENT [DKT. NO. 107]**

*"The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny."*

The Federalist No. 47, at 324
(James Madison) (J. Cooke ed.1961)

\*                    \*                    \*

On June 8, 2025, the Department of Homeland Security ("DHS") issued a Press Release accusing "California politicians and rioters" of "defending heinous illegal noncitizen[1] criminals at the expense of Americans safety." Press Release,

---

[1] This Order uses the term "noncitizenship" in place of "alienage" and "noncitizen" in place of "alien." The Court follows the U.S. Supreme Court and Ninth Circuit, where the use of the term "noncitizen" has become a common practice. *See Patel v. Garland*, 596 U.S. 328 (2022) (Barrett, J.); *United States v. Palomar-Santiago*, 593 U.S. 321 (2021) (Sotomayor, J.); *Barton v. Barr*, 590 U.S. 222, 226 n.2, (2020) (Kavanaugh, J.) ("This opinion uses the term 'noncitizen' as

U.S. Dep't of Homeland Security, *ICE Captures Worst of the Worst Illegal
[Noncitizen] Criminals in Los Angeles Including Murderers, Sex Offenders, and
Other Violent Criminals*, (June 8, 2025), [https://perma.cc/Y6NC-RZUZ].  In
recounting the operations by Immigrations and Customs Enforcement ("ICE") in
Los Angeles, California, that same Press Release reported that ICE arrested "some
of the worst of the worst criminal illegal noncitizens." *Id.*

   In the days, weeks, and now months following this initial Press Release,
DHS has issued many more similar press releases.[2]  These Press Releases repeat

---

equivalent to the statutory term 'alien.'" (citing 8 U.S.C. § 1101(a)(3))); *Avilez v.
Garland*, 69 F.4th 525 (9th Cir. 2023); *Arce v. United States*, 899 F.3d 796 (9th Cir.
2018).  Additionally, this Court thinks it is prudent to "avoid language that
reasonable readers might find offensive or distracting—unless the biased language
is central to the meaning of the writing." *Chicago Manual of Style Online* 5.253,
https://www.chicagomanualofstyle.org/book/ed17/part2/ch05/psec253.html.  As
noted by the Ninth Circuit, "[t]he word alien can suggest 'strange,' 'different,'
'repugnant,' 'hostile,' and 'opposed[.]'" *Avilez*, 69 F.4th at 527 n.1 (citing *Alien*,
*Webster's Third New International Dictionary* 53 (2002)).  Accordingly, because
the word "noncitizen" is synonymous and does not encompass such negative
connotations, the Court finds "noncitizen" is a better word choice.  *See Alien* and
*Noncitizen*, *American Heritage Dictionary of English Language* 44, 1198 (5th ed.
2011).

   [2] Although the following list is non-exhaustive, *see e.g.*: Press Release, U.S.
Dep't of Homeland Security, *ICE Continues to Arrest Vicious Illegal [Noncitizen]
Criminals as Rioters Continue to Disrupt Law Enforcement*, (June 9, 2025),
[https://perma.cc/5TK6-666D]; Press Release, U.S. Dep't of Homeland Security,
*DHS Reveals More Heinous Criminal Illegal [Noncitizens] Including a Murderer,
Pedophile, and Drug Traffickers Arrested during Los Angeles Operation*, (June 11,
2025), [https://perma.cc/7SHG-THXX]; Press Release, U.S. Dep't of Homeland
Security, *Since DHS Immigration Enforcement in Los Angeles Began, Border
Crossings Continue to Plummet*, (June 24, 2025), [https://perma.cc/YJ4Z-ZLTN];
Press Release, U.S. Dep't of Homeland Security, *ICE Arrests Worst of the Worst
Criminal Illegal [Noncitizens] Who Victimized Americans*, (July 16, 2025),
[https://perma.cc/XR22-NZ8A]; Press Release, U.S. Dep't of Homeland Security,
*Despite Riots and Assaults, ICE and Border Patrol Arrest Worst of the Worst
Criminal Illegal [Noncitizens] Including Rapists, Gang Members, Murderers, and
Pedophiles in Los Angeles*, (Aug. 27, 2025), [https://perma.cc/6QKG-5HZ5]
[hereinafter, "August 27, 2025 Press Release"]; Press Release, U.S. Dep't of
Homeland Security, *More Than 10,000 Illegal [Noncitizens] Arrested in Sanctuary*

rhetoric suggesting ICE operations are limited to the "worst of the worst": criminal noncitizens.  *Id.*

Even though "[d]eportation is not a criminal proceeding," *Carlson v. Landon*, 342 U.S. 524, 538 (1952), DHS has issued the following statements in its Press Releases:

- "DHS law enforcement has made over 5,000 arrests in Los Angeles. That's more than 5,000 criminal illegal [noncitizens]."[3]

- "U.S. Customs and Border Protection (CBP) and Immigration and Customs Enforcement (ICE) have made more than 10,000 arrests of illegal [noncitizens]—including murderers, kidnappers, sexual predators, and armed carjackers—in Los Angeles, California since June 2025."[4]

"Worst of the worst" is an inaccurate description of most of those affected by DHS and ICE's operations.  Perhaps in utilizing this extreme language DHS seeks to justify the magnitude and scope of its operations against non-criminal noncitizens.  Maybe that phrase merely mirrors the severity and ill-natured conduct by the Government.  Even though these press releases might contain an inkling of truth, they ignore a greater, more dire reality.

Americans have expressed deep concerns over unlawful, wanton acts by the executive branch.  It is not the "worst of the worst" that are swept into the nationwide and reckless violations of the law by the executive branch.  In the past weeks, the Government detained Adrian Conejo Arias and his five-year-old son without a valid warrant.  [*See* Dkt. No. 9 in *Adrian Conejo Arias v. Kristen Noem et al.*, Case No. 5:26-cv-00415-FB (W.D. Tex. Jan. 31, 2026)].  Beyond its terror against noncitizens, the executive branch has extended its violence on its own

---

*Los Angeles Since DHS Launched Operations in June*, (Dec. 11, 2025), [https://perma.cc/6LV9-G65C] [hereinafter, "December 11, 2025 Release"]; Press Release, U.S. Dep't of Homeland Security, *ICE Arrests 118 Illegal [Noncitizens] Including Pedophiles, Burglars, Domestic Abusers, and Serial Drunk Drivers in California Surge Operation*, (Jan. 5, 2026),  [https://perma.cc/6XKB-DPJC].

[3] *See* August 27, 2025 Press Release.

[4] *See* December 11, 2025 Press Release.

citizens, killing two American citizens— Renée Good and Alex Pretti—in Minnesota.

The threats posed by the executive branch cannot be viewed in isolation. Consider the undisputed facts of this case. [Dkt. No. 42 at 22; Dkt. No. 60 at 16].

## I.    BACKGROUND

Lazaro Maldonado Bautista has no criminal record and has lived in Los Angeles, California for approximately four years.  [Dkt. No. 15 ¶¶ 56, 57, "Class Complaint"].  He has worked at the same company since 2021 and carries deep ties to Southern California, with "several U.S. citizen family members who live in the area."  [*Id.* ¶ 57].  Despite his background, DHS and ICE arrested Bautista on June 6, 2025, as part of a concerted immigration operation in Los Angeles.  [*Id.* ¶ 58].  After his arrest, the Government denied Bautista release on bond and detained him at the Adelanto ICE Processing Center in Adelanto, California.  [*Id.* ¶¶ 58, 60].  Bautista requested a bond redetermination hearing before an immigration judge ("IJ").  [*Id.* ¶ 60].  Instead of conducting a bond determination hearing, an IJ issued a decision stating it lacked jurisdiction to do so.  [*Id.* ¶ 61].

Bautista is but one of hundreds, if not thousands, of noncitizens with no criminal background that have been arrested and detained by the Government for being in the country without admission.  The Supreme Court has said before, generally, "it is not a crime for a removable [noncitizen] to remain present in the United States."  *Arizona v. United States*, 567 U.S. 387, 407 (2012).  Consider the Supreme Court's description of what would happen in Bautista's situation:

> If the police stop someone based on nothing more than possible removability, the usual predicate for an arrest is absent.  When [a noncitizen] is suspected of being removable, a federal official issues an administrative document called a "Notice to Appear."  *See* 8 U.S.C. § 1229(a); 8 CFR § 239.1(a).  The form does not authorize an arrest.  Instead, it gives the [noncitizen] information about the proceedings, including the time and date of the removal hearing.  *See* 8 U.S.C. § 1229(a)(1).  If [a noncitizen] fails to appear, an *in absentia* order may direct removal.  § 1229a(b)(5)(A).

*Id.*

This is not what happened to Bautista or many others like him.

### A.    The Original Case and its Adjudication

Respondents refused to release Bautista or grant him a bond hearing.
Bautista, along with other Plaintiff Petitioners, initially filed a Petition for Writ of
Habeas Corpus on July 23, 2025.  [Dkt. No. 1, "Habeas Petition"].  The Habeas
Petition came fifteen days following an internal memorandum circulated to all ICE
Employees.  [*See* Dkt. No. 5-2 at 44–46, "Interim Guidance" or "DHS Policy"].

Issued on July 8, 2025, the Interim Guidance "serve[d] as notice that DHS,
in coordination with the [DOJ], . . . revisited its legal position on detention and
release authorities."  [DHS Policy at 45].[5]  In the Interim Guidance, the DHS and
DOJ acknowledged that a new legal interpretation  of the Immigration and
Nationality Act ("INA") to "ensure immediate and consistent application" as to
DHS's authority to detain noncitizens from immigration detention.  [*Id.*].

Respondents detained Bautista, and refused to provide him with a bond
hearing or release him from unlawful detention until this Court ordered as such.
[Dkt. No. 14, "TRO Order"].  In the time since issuing that initial order, the Court
declared as a matter of law that indefinite detention for Bautista and those similarly
situated is unlawful.  The number of people in Bautista's exact situation was so
large that the Court found it appropriate to certify a nationwide class to which this
declaration of law would apply.  But declaratory relief was not the only form of
relief ordered.  The Court also vacated the underlying DHS Policy that the
Government relied on to continue detaining people like Bautista.

On each occasion, and with each ruling being based on a more developed
factual record than before, the Court determined the DHS Policy improperly
interpreted the INA and that continued detention of Plaintiff Petitioners and those
similarly situated was unlawful.  [TRO Order; Dkt. No. 81, "Partial MSJ Order;
Dkt. No. 92, "Reconsideration Order"; Dkt. No. 93, "Amended Consolidated
Order"].

One might assume that four separate orders issued by a federal district court
interpreting a federal statute would make clear that enforcing executive policies

---

[5] For a full description of the DHS Policy, the impact of its change in legal
interpretation, and a brief history of the Immigration and Nationality Act, the Court
incorporates its factual background from its Amended Consolidated Order issued
on December 18, 2025.  [Dkt. No. 93, "Amended Consolidated Order"].

premised on a contrary legal interpretation is improper.  Remarkably, that has not
been the case.

### B.    Non-Compliance by Respondents

For sake of brevity, the Court only recounts key developments following this
Court's final judgment issued on December 18, 2025.  [*See* Dkt. No. 94].  Each of
the events below reflects Respondents' failure to comply with the Final Judgment;
however, given the breadth and volume of events, the Court cannot provide an
exhaustive account.

### 1.    Increased Habeas Filings in this Court

As indicated on multiple occasions by the Court, Respondents'
noncompliance has caused a routine process of adjudicating habeas petitions and
temporary restraining orders.  [Dkt. No. 107-2, "Transcript" at 10:6-22].

For context, the Court's review of filings within this judicial district shows
551 habeas petitions were filed between December 19, 2025, and January 30,
2026.  In other words, that is the number of habeas petitions filed since the Court
issued its final judgment as of today.  This is a relatively large figure; the Court's
search of habeas petitions filed within this judicial district between January 1,
2025, to July 8, 2025, indicates a total of 165 habeas petitions that were filed.

Certainly, not all 551 habeas petitions were filed by members of the Bond
Eligible Class.  However, the Court can confirm a considerable portion of these
petitions in fact were.  As of this date, over 70 habeas filings in this Court have
been expressly designated as related to this matter.  Many others lack such
designation but nevertheless fall within the same category.  An increase in habeas
filings alone may not strike the Court's attention.  However, ample evidence
demonstrates Respondents' noncompliance with the Final Judgment.

### 2.    Events Across the Country

Respondents' noncompliance with the Final Judgment has taken a toll on
wrongfully detained noncitizens, courts, and government and Petitioners'
attorneys.

The Court has identified over 400 cases nationwide following this Court's
Final Judgment in which district courts have granted habeas petitions filed by
Bond Eligible Class members.  WESTLAW, + (habeas /5 grant!) "Bautista", 405
results (Feb. 5, 2025) (filtered by Search within Results +"grant! /20 bond", "Date

After 12/18/2025").  Attorneys for Respondents in cases involving Bond Eligible Class members report backlogs at the EOIR, which have caused difficulties in scheduling bond hearings for Bond Eligible Class Members.  [*See e.g.*, Dkt. No. 7 *Olga Sosa Inzuna v. Warden of Adelanto Detention Facility et al*., Case No. 5:26-cv-00078-SSS-BFM (referencing "the backlog of cases at the EOIR"); *see id.* at Dkt. No. 10 (reporting Petitioner did not receive her bond hearing within the 7-day window outlined by the Court)].

In the United States District Court for the District of Minnesota, an attorney representing some of the same Respondents that are party to this case requested that the Court hold her in contempt "so that [counsel] can have a full 24 hours of sleep."  [Dkt. No. 19 at 30:24-25, in *Tot-Choc v. Bondi et al.*, 0:26-cv-00167-JWB-JFD (D. Minn. Feb. 3, 2026)].  Respondents are under extraordinary strain.  No irony is lost on the Court.  Respondents have chosen to avail themselves of these exact circumstances of which they now complain.

### 3.    Parties' Joint Status Report

Per the Court's Amended Consolidated Order, the parties filed a Joint Status Report detailing their respective positions and requests on January 9, 2026.  [Dkt. No. 100, "Joint Status Report"].  In the Joint Status Report, Plaintiff Petitioners expressed concerns as to whether Respondents had adequately provided relief in accordance with the final judgment.  [*Id.* at 2–4].  Plaintiff Petitioners observed that IJs continued to follow the BIA's legal interpretation in *Matter of Yajure Hurtado*, which endorsed a position identical to the DHS Policy.  [*Id.* at 3].  Respondents disagreed that "any further relief [was] required or warranted regarding the declaratory judgment" that was part of the final judgment.  [*Id.* at 5].

The Status Conference to discuss next steps in this matter was originally scheduled for January 16, 2026; however, the Court was made aware of a material development shortly before the hearing that required the parties briefing: an article containing an email containing nationwide guidance from Chief Immigration Judge Teresa L. Riley that questioned this Court's final judgment.  [*See* Dkt. No. 101, "Minutes of Status Conference"].  The Court notified parties of its intent to continue the status conference by a week.  [*Id.*].

To provide parties with an opportunity to brief their positions, the Court issued an order on January 16, 2026, which detailed questions regarding Chief Immigration Judge Teresa L. Riley's email, specific issues regarding compliance with the final judgment, and how the parties intended to proceed.  [Dkt. No. 102].

The parties submitted their respective written responses on January 20, 2026.
[Dkt. Nos. 103, 104].

Respondents' submission raised several issues.  For purposes of this Motion,
the only relevant issue is whether Respondents have complied with the Court's
final judgment.  In espousing their compliance with the Court's final judgment,
Respondents made several observations.

*First,* Respondents indicated DHS "is no longer relying on the [DHS
Policy]," but that "DHS is not the BIA and does not set policy for immigration
judges." [Dkt. No. 103 at 4].

*Second*, Respondents suggested compliance with the Court's final judgment
because "the Court has not vacated *Matter of Yajure Hurtado*." [*Id.* at 4–5].
Respondents clarified that their position "remains . . . that *Matter of Yajure
Hurtado* is the correct interpretation on detention of applicants for admission." [*Id.*
at 5].  Nevertheless, Respondents noted "[e]ven if [*Matter of Yajure Hurtado*] were
vacated, immigration courts would follow circuit precedent and the statutory text
under their *own interpretive authority*." [*Id.* (emphasis added)].

*Finally*, because the Court issued a declaratory judgment, Respondents
suggested "the practical implication . . . is, at most, limited to its preclusive effect
in habeas litigation filed by [Bond Eligible Class members]." [Dkt. No. 103 at 5].
As such, Respondents concluded Chief Immigration Judge Teresa L. Riley's
nationwide guidance "merely restates th[e] premise" that "immigration judges are
bound by precedential decisions of the BIA." [*Id.* at 6].

### 4.    January 22, 2026 Status Conference

A review of the transcript from the January 22, 2026 Status Conference
makes clear why this Motion is before the Court. [*See* Dkt. No. 107-2,
"Transcript"].  Respondents were unable to provide substantive responses to
questions regarding compliance with the final judgment.

### i.    Compliance with Final Judgment by Particular Respondents

As indicated before, Respondents indicated the DHS no longer relied on the
Interim Guidance containing the DHS Policy following the final judgment. [Dkt.
No. 103 at 4].  However, the DHS is not the only agency that is party to the case.

Among Respondents upon whom service has been executed are the
following: DHS; Attorney General, Pamela Bondi; the Executive Office for
Immigration Review ("EOIR"); ICE; Acting Director of ICE, Todd Lyons;
Secretary of Homeland Security, Kristi Noem; then-Acting Director of EOIR,
Sirce Owen; and Acting Director, Los Angeles Field Office Immigration and
Removal Operations, Ernesto Santacruz, Jr.  [Dkt. No. 47, "Proof of Service"].
The Court is aware that DHS is not the entity responsible for setting policy for IJs.
That is the EOIR, a party to the case.

When the Court inquired as to the EOIR's compliance with the final
judgment, Respondents suggested the "EOIR was not coerced to do anything" and
"other forums [were] to determine" the preclusive effect of this Court's judgment
due to the appeal filed in this matter.  [Transcript at 7:13–14, 8:22–25].

Nevertheless, because much of the Court's concern dealt with the volume of
habeas petitions filed in this judicial district, the Court redirected Respondents to
discuss the preclusive effect of *this Court's* final judgment in *this judicial district*.
Respondents provided no immediate answer; instead, Respondents stated they
"would have to brief that specifically." [Transcript at 9:22–25].

### ii.    Respondents' Justification for Current Circumstances

Lacking clarity as to the basis for Respondents' position, the Court asked
Respondents to explain why IJs continue to rely on *Yajure Hurtado* despite the fact
its underlying legal interpretation was found irreconcilable with this Court's
declaration of law.  [Transcript at 18:3–19:15].  Respondents confirmed their
argument was "[e]ssentially" that *Yajure Hurtado* remains a "valid legal
interpretation . . . binding all [immigration judges] due to the BIA's power to issue
precedential decisions."  [*Id.* at 18:6–11].  Upon confirming that Respondents
attributed the precedential effect of the BIA's opinion in *Yajure Hurtado* to the
agency's regulations, Respondents also agreed that there was nothing beyond "the
interpretation and the binding controlling authority of *Yajure Hurtado*" justifying
"the continued detention of and denial of bond hearings for [Bond Eligible Class
members]."  [*Id.* at 22:17–23:5, 26:11–19].

Upon ascertaining Respondents' positions, the Court then asked whether
Respondents' position "privilege[ed] an executive agency's legal interpretation
over a federal district court's legal interpretation."  [Transcript at 18:12-15].  The
Court did not receive a definitive response from Respondents; again, Respondents

noted their willingness "to address [that issue] in briefing" and that they were "not in a position to answer" the question.  [*Id.* at 19:16–18, 20:19–20].

Finally, the Court asked whether "executive bodies within the EOIR [were] complying with the regulations pursuant to the bond hearings . . . as interpreted by this Court in the final judgment."  [Transcript at 23:18–21; 23:17–20].  Once more, Respondents stated they would have to brief the issue.  [*Id.* at 25:19–20].

In the days following the Status Conference, 282 habeas petitions have been filed in this Court as of February 15, 2026.  Although not all these filings fall within the scope of this case, many are indeed filed by Bond Eligible Class members in indefinite detention.

Consistent with their position in the Joint Status Report, Plaintiff Petitioners have filed this Motion pursuant to 28 U.S.C. § 2202.  [Dkt. No. 107, "Motion"; Dkt. No. 111, "Reply"; *see also* Dkt. No. 100, "Joint Status Report"].  The Motion follows a final decision on the merits of Counts I, II, and III of Plaintiff Petitioners' Amended Class Complaint and entry of final judgment.  [*See* Dkt. No. 94, "Final Judgment"].  Ordinarily, a final decision "generally . . . ends the litigation on the merits and leaves nothing for the court to do but execute the judgment."  *Catlin v. United States*, 324 U.S. 229, 233 (1945).  As detailed above, this Motion has become necessary to do exactly that: execute the judgment.

Respondents have far crossed the boundaries of constitutional conduct.[6]  Somehow, even after the judicial declaration of law that the DHS was misguided in its act of legal interpretation that nullified portions of a congressionally enacted statute, Respondents still insist they can continue their campaign of illegal action.  The shameless submission that is Respondents' Opposition deliberately seeks to

---

[6] The Court recognizes the Fifth Circuit reached a contrary decision on the issue of statutory interpretation in this case.  *See Buenrostro-Mendez v. Bondi*, No. 25-20496, 2026 WL 323330 (5th Cir. Feb. 6, 2026).  First, the Court finds relevant that Petitioners in *Buenrostro-Mendez* "concede that they are applicants for admission within the meaning of § 1225(a)(1)," unlike Petitioners here.  *Id.* at *4.  Second, though Respondents may hedge their position on this newly issued opinion, the Court notes their noncompliance with the Final Judgment precedes this decision.  Finally, the decision coming out of the Fifth Circuit is not binding on this Court.  To effectuate the final judgment already issued by this Court months before the Fifth Circuit's determination, the Court proceeds with this Motion.

erode any semblance of separation of powers.  [*See* Dkt. No. 110, "Opposition" or "Opp."].

Respondents can only do so in a world where the Constitution does not exist. The Constitution makes no apology in condemning Respondents.  With no other option but to uphold its constitutional duty, the Court **GRANTS** Petitioners' Motion.

## II.    LEGAL STANDARD

The Declaratory Judgment Act establishes the ability for "any court of the United States, upon the filing of an appropriate pleading" to "declare the rights and other legal relations of any interested party seeking such declaration.  *See* 28 U.S.C. § 2201.  Moreover, the Act permits courts to grant "[f]urther necessary or proper relief based on a declaratory judgment" against any adverse party whose rights have been determined by such judgment after "reasonable notice and hearing."  *See* 28 U.S.C. §§ 2201, 2202.

## III.    DISCUSSION

### A.    Jurisdictional Issues

The Declaratory Judgment Act does not confer nor serve as an independent basis for subject matter jurisdiction.  *California Ass'n of Emp. v. Bldg. & Const. Trades Council of Reno, Nev. & Vicinity*, 178 F.2d 175, 177 (9th Cir. 1949); *see also TIG Ins. Co. v. Reliable Research Co.*, 334 F.3d 630, 634 (7th Cir. 2003).

However, Respondents' misplaced fixation on the Declaratory Judgment Act comes at the cost of ignoring the Administrative Procedure Act ("APA").  The APA was enacted "in part to offer additional protections beyond the minimum constitutional requirements of due process."  Martin H. Redish, *Due Process as American Democracy* 146 (2024).

Indeed, the APA confers on this Court the jurisdiction to enter further relief for the same reasons discussed in the Amended Consolidated Order.  [*See* Dkt. No. 93 at 20–24].  Moreover, the Ninth Circuit's recent order in *National TPS Alliance v. Noem* included discussion consistent with this Court's analysis as to the availability of vacatur as an APA remedy.  *See Nat'l TPS All. v. Noem*, No. 25-5724, 2026 WL 226573, at *17–18 (9th Cir. Jan. 28, 2026).  Therefore, the Court assures it operates within the confines of its subject matter jurisdiction in issuing further relief.

Furthermore, though Respondents challenge this Court's jurisdiction to amend its judgment pending an appeal, Respondents are incorrect.  [*See* Opp. at 4 (citing *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982))].

Although the Ninth Circuit has yet to discuss the intersection of *Griggs* and § 2202, "[c]ourts that have addressed when a motion for further relief may be brought under § 2202 have consistently held that neither the filing of an appeal nor a lengthy delay after the trial court's initial ruling terminates the court's authority to grant further relief pursuant to § 2202." *United Tchr. Assocs. Ins. Co. v. Union Lab. Life Ins. Co.*, 414 F.3d 558, 572 (5th Cir. 2005) (collecting authorities from three circuits and indicating that *Griggs* operates as no bar).

To the extent Ninth Circuit precedent touches on similar principles, *In re Padilla*, the very case to which Respondents cite, states that a "trial court also retains jurisdiction to implement or enforce the judgment or order but may not alter or expand upon the judgment" during an appeal.  *In re Padilla*, 222 F.3d 1184, 1190 (9th Cir. 2000).  The truncated quote by Respondents assumes that the Court alters or expands the judgment by granting Petitioners' requested relief.  Once again, Respondents are incorrect.  The Motion seeks to *enforce* the judgment.

Having ensured no jurisdictional bars prevent evaluating this Motion, the Court now determines whether further relief is warranted.

## B.    Propriety and Scope of Relief

The only prerequisites to grant further relief under § 2202 are provision of reasonable notice and hearing.  § 2202.  That has been provided.  [*See* Dkt. No. XX].  Further relief, based on the original declaratory judgment, may be granted wherever it is either "necessary *or proper*."  § 2202 (emphasis added).

The sole remaining question is whether further relief is necessary or proper.  Petitioners argue their requested relief is necessary *and* proper.  [Motion at 3–11].  Respondents maintain the opposite.[7]  [Opp. at 5–11].

---

[7] To the extent Respondents argue that classwide notice is neither necessary nor proper under § 2201, the Court reminds Respondents of Rule 23(d)(1)(B), which permits courts to issue orders giving appropriate notice.  Necessity and propriety are not the governing standards under Rule 23(d)(1)(B); thus, Respondents arguments in the Opposition are non-responsive.

To demonstrate necessity of further relief, Petitioners point to the nationwide guidance issued by Chief Immigration Judge Teresa L. Riley.  [Motion at 3–4].  The guidance effectively encourages IJs across the country to stay the course of violating the rights of Bond Eligible Class Members.  And so they did.

Petitioners also submitted the opinion of IJ Holly D'Andrea who speculated as to the intent of this Court's holding in *Bautista*, its reach, and its impact on IJs.  [*See* Dkt. No. 107-3 at 2–4].

Notably, IJ D'Andrea observed that this Court's orders have left "[immigration courts] in the awkward position of being told that the policy of Hurtado is not tenable but its holdings and dictates are not overruled."  [Dkt. No. 107-3 at 3].

Ordinarily, the Court would not state basic principles of law to avoid pontification.  Yet separation of powers concerns is at the heart of this case, this Court's exercise of authority, and this country's foundational principles imbued in the Constitution.  Respondents appear to have little regard for such fundamental tenets; thus, a brief lesson in legal history is apt.

Separation of powers as well as checks and balances are essential components to this country's founding.  The Constitution is evidence of that fundamental premise.  The words and structure of the Constitution anticipate that the three branches of government would be in tension with one another.  *See* Redish, *supra*, at 3 (describing the Framers' design of the constitutional system "to protect against the risk of a dominant faction abusing its power").  There is nothing "awkward" or "confusing" about that, as Respondents and IJs suggest.  [*See* Opp. at 6; Dkt. No. 107-3 at 3].

The current reality that two branches of government are at odds with one another is not an anomaly.  It is the very nature of the government put into place by the Framers.  "[T]he great security against a gradual concentration of the several powers in the same department, consists in giving to those who administer each department the necessary constitutional means and personal motives to resist encroachments of the others."  The Federalist No. 51 (J. Madison).  James Madison posited that "[a]mbition must be made to counteract ambition," and "such devices should be necessary to control the abuses of government."  *Id.*

When considering one branch's aggrandizement of power, Chief Justice John Marshall confirmed that the Constitution "establish[ed] certain limits not to be transcended." *Marbury v. Madison*, 5 U.S. 137, 176 (1803).

Respondents engage in unlawful practices under the guise of "immigration enforcement" and fidelity to agency regulations. Those practices were found unlawful by way of statutory interpretation by this Court.

"[I]nterpretation of the laws" is "the proper and peculiar province of the courts." The Federalist No. 78, at 525 (A. Hamilton) (J. Cooke ed. 1961). The Supreme Court observed recently that "the Framers structured the Constitution to allow judges to exercise that judgment independent of influence from the political branches." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 385 (2024) (citations omitted).

That independence is crucial. It is precisely why Alexander Hamilton referred to the judicial branch as the "least dangerous to the political rights of the Constitution." The Federalist No. 78, at 523 (A. Hamilton) (J. Cooke ed. 1961). The judiciary "will be least in a capacity to annoy or injure [those rights]." *Id.* Courts have "no influence over either the sword or the purse; no direction either of the strength or of the wealth of the society; and can take no active resolution whatever." *Id.*

The judiciary, having "neither force nor will," possesses "merely judgment." *Id.* Judgment carries power. "[A]n order issued by a court with jurisdiction over the subject matter and person must be obeyed by the parties until it is reversed by orderly and proper proceedings." *United States v. United Mine Workers of Am.*, 330 U.S. 258, 293 (1947).

Respondents cannot relitigate the validity of the Court's final judgment here nor continue to endorse an executive interpretation of law that is contrary to the final judgment's declaration of law. "It is for the court of first instance to determine the question of the validity of the law, and until its decision is reversed for error by orderly review, either by itself or by a higher court, its orders based on its decision are to be respected." *Howat v. State of Kansas*, 258 U.S. 181, 180–90 (1922).

As evidenced by the volume of habeas petitions filed by Bond Eligible Class members and the conduct of Respondents in continuing to violate the rights of those class members, further is relief necessary to effectuate the Final Judgment.

Given the circumstances surrounding Respondents' noncompliance and its threat to separation of powers, the Court finds further relief is proper to fulfill this Court's constitutional duties.

### C.    Form of Further Relief

Respondents have violated and continue to violate the law by detaining Bond Eligible Class members in contravention of the Final Judgment.  Worse, Respondents proffer frivolous arguments that aim to insulate unlawful policies from judicial review while taking positions that seek to bludgeon separation of powers into oblivion.  [*See generally* Opp.; *see also* Dkt. No. 103].

Respondents' fixation on the "coercive" nature of the declaratory judgment issued by the Court ignores the other form of relief expressly granted by the Court: vacatur under the APA.  Thus, the only relevant argument raised in the Opposition is Respondents' suggestion that *Yajure Hurtado* is not the DHS Policy that was previously vacated, and that *Yajure Hurtado* remains binding upon IJs because the BIA issued it.

Respondents engage in a deliberately dense three-step maneuver to reach their core absurd conclusion that no further relief is warranted.

- **Step 1**: Identify an immaterial difference between two things that are functionally the same.  [Opp. at 9; Dkt. No. 103 at 3].
- **Step 2**: Insist that the immaterial difference is so consequential that it can violate separation of powers.  [Opp. at 12; Dkt. No. 103 at 3].

Finally, and most importantly,

- **Step 3**: Make sure to never mention the Constitution with the hope that a federal court will not notice.  [*See generally* Opp.; Dkt. No. 103 at 3].

Learned helplessness, no matter how much Respondents may try to will it upon the judiciary, is not an option.  All *Yajure Hurtado* does is parrot the DHS Policy.  *Yajure Hurtado* contains an identical, incorrect interpretation of law.  It is merely in another form.  Yet Respondents state that *Yajure Hurtado* controls because the BIA issues precedential decisions binding on IJs.

It is "emphatically the province and duty of the judicial department to say what the law is."  *Marbury v. Madison*, 5 U.S. 137, 177 (1803).  It is not the executive department's province and duty to say what the law is.  The role of the

judiciary is to continue to demand compliance with the law even in the face of outright defiance by the executive. When asked by the Court to articulate any other justification for Respondents' continued course of action in the event *Yajure Hurtado* were to be vacated, Respondents indicated they were not aware of anything else that would require IJs to deny bond hearings. [Transcript at 26:20–27:7].

As the Ninth Circuit has recently indicated, vacatur under the APA sets aside unlawful actions and "restore[s] the status quo." *Nat'l TPS All.*, 2026 WL 226573 at *17. In restoring the status quo, this Court's final judgment made clear that agency action contrary to the declaration of law was set aside under the APA. The Court's Amended Consolidated Order stated that "the interpretation in *Yajure Hurtado*, 29 I. & N. Dec. 216, which contradicts the Court's reasoning is no longer controlling." [Dkt. No. 93 at 20]. The Court, possibly out of naivete, entrusted Respondents to abide by the law as declared in the Final Judgment. Instead, Respondents choose to privilege an executive interpretation of law over the judiciary's.

*Yajure Hurtado* is functionally equivalent to the DHS Interim Policy, though Respondents seek to obfuscate the identity of these executive actions by referencing internal agency regulations to which Respondents selectively adhere. [*See* Transcript at 22:6–25:20].

The Court's initial decision to deny Petitioners' request to vacate *Yajure Hurtado* under the APA was an act of judicial restraint: a formality. However, based on the representations Respondents have made to the Court, it is evident that further relief is both necessary and proper. The Court **VACATES** *Yajure Hurtado* under the APA.

## D.    Notice to Bond Eligible Class

Beyond the scope of the Motion, the Court ordered parties to brief proposed methods of classwide notice. [*See* Transcript at 29:25–30:17]. Respondents suggest that Petitioners' proposed forms of notice are neither "necessary nor proper." [Opp. at 5]. In doing so, Respondents describe the proposed notice as overbroad, repetitive, burdensome, and unworkable. [*Id.* at 5–8].

As a preliminary matter, necessity and propriety are not the standards by which the Court may issue orders requiring notice to a certified class. *See* Fed. R. Civ. P. 23(d)(1)(B). Rather, Rule 23(d) permits a court to issue orders on

"procedural matters" to "protect class members and fairly conduct the action." Fed. R. Civ. P. 23(d)(1)(B), (E). This includes entering orders "giving appropriate notice to some or all class members" of "any step in the action[.]" Fed. R. Civ. P. 23(d)(1)(B)(i); *see also* Fed. R. Civ. P. 23 advisory committee's note to 1966 amendment ("Notice is available fundamentally for the protection of the members of the class or otherwise for the fair conduct of the action[.]"); *id.* ("Subdivision (d)(2) does not require notice at any stage, but rather calls attention to its availability and invokes the court's discretion.").

Therefore, the Court evaluates Petitioners' proposals for notice and Respondents' objections to those proposals based on whether the methods of notice are appropriate to protect class members and would fairly conduct this action.

Where Respondents oppose classwide notice, it appears to be based in an argument that classwide notice is an improper remedy. [*See* Opp. at 5–8]. Respondents aver that Petitioners' requests "are no more than thinly-guised attempts to impermissibly alter and expand the Court's earlier judgment by increasing the coercive and injunctive effect of that judgment and imposing operationally impracticable burdens on Respondents." [*Id.* at 2]. Once again, Respondents are incorrect. Notifying individuals of their rights as Bond Eligible Class members neither imposes coercive effect nor grants injunctive relief as prohibited by § 1252(f)(1).[8] As indicated above, classwide notice is a *procedural* matter that the Court may issue in its authority to conduct the action. *See* Fed. R. Civ. P. 23(D).

Indeed, other district courts have ordered classwide notice in similar cases. *See Guerrero Orellana v. Moniz*, No. 25-CV-12664-PBS, 2025 WL 3687757 at *9–11 (D. Mass. Dec. 19, 2025) (ordering notice in a certified class on the issue of immigration bond hearings for habeas petitioners); *Rodriguez Vazquez v. Hermosillo*, No. 3:25-CV-05240-TMC, 2026 WL 102461 at *6–7 (W.D. Wash. Jan. 14, 2026) (same).

Consistent with the circumstances described above, classwide notice is necessary to protect class members and fairly conduct the action. Let us return to

---

[8] Given Respondents' insistence on the limited relief available to Petitioners, the Court also finds it necessary to clarify that § 1252(f) does not impose a *per se* prohibition on classwide injunctive relief. Specific carveouts as to the availability of classwide injunctive relief in certain actions are detailed in 1252(f)(3).

Respondents' argument that Petitioners' proposed notice for Bond Eligible Class members is burdensome or unworkable. [*See* Opp. at 5–8].

Recall Respondents are DHS, ICE, and EOIR as well as the individuals at the head of these executive bodies. Together, Respondents could stop the continued, unlawful detention of Bond Eligible Class members. Compliance with the Final Judgment would obviate the need for classwide notice and this Motion.

Nevertheless, Respondents choose to disregard this Court's declaration of law and vacatur of unlawful agency action. They instead insist that agency regulations dictating the EOIR's structure require IJs to follow *Yajure Hurtado*. [Opp. at 9]. Never mind that Respondents necessarily violate other agency regulations that confer procedural protections and rights for noncitizens by following *Yajure Hurtado*. *See* 8 C.F.R. §§ 1003.19, 1236.1. Respondents insist they must comply with agency regulations; in the same breath, they choose one regulation over another. Respondents do not appear familiar with their regulations when cherrypicking which to abide by, even though one provides procedural protections while the other merely outlines the internal hierarchy of the agency.

The result? Bond Eligible Class members must affirmatively seek habeas relief because Respondents deny them the individualized bond hearings to which the class members are entitled.

The tragedy behind the current situation: Respondents' compliance with this Court's orders would solve the problem for both sides.

Respondents can continue to waste limited, valuable resources; the Court will in turn continue to protect due process and the principles of separation of powers by articulating the rights of Bond Eligible Class members. The time and cost of doing so is not a waste, though it comes at the heavy price of the unwarranted detention of many Bond Eligible Class members.

The Court **ORDERS** classwide notice of the Final Judgment. The form by which Respondents are ordered to give notice is attached in the Appendix hereto.

### E.    Rule 11 Considerations

Finally, Petitioners reiterate concerns raised at the Status Conference regarding misrepresentations or frivolous arguments made by Respondents in this matter. [*See* Transcript at 13–14]. As Respondents indicate, no Rule 11 motion

has been properly filed nor presented such that Respondents may benefit from the mandatory 21-day period.  [Opp. at 11].  No further discussion is necessary as to this issue.[9]

## IV.    CONCLUSION

In accordance with its authority under § 2202, the Court **GRANTS** Petitioners' Motion.  The Court hereby **VACATES** *Matter of Yajure Hurtado* as contrary to law under the APA.

Furthermore, the Court **ORDERS** classwide notice as follows:

**Form of Notice:**  Respondents shall give notice in the form attached in the Appendix hereto ("the Notice").  Respondents shall forthwith translate the notice into, at minimum, Spanish.

**Where Notice Shall Be Provided:**

- **Online Detainee Locator System Site**: Within 48 hours of the date of this Order, DHS shall post the Notice on its Online Detainee Locator System site found at https://locator.ice.gov/odls/ in English and Spanish.

- **Department of Homeland Security Site**: Within 48 hours of the date of this Order, DHS shall post the Notice on the landing page of its site found at https://www.dhs.gov/ in English and Spanish.

- **Adelanto Detention Center/Immigration Court:** Within 48 hours of the date of this Order, Adelanto Detention Center and Adelanto Immigration Court shall post the Notice in English and Spanish, in common areas of its facilities holding immigration detainees.

- **EOIR Case Information Site:** Within 48 hours of the date of this Order, the EOIR is ordered to post the Notice on its EOIR Case Information site found at https://www.justice.gov/eoir/eoir-case-information in English and Spanish.

---

[9] The Court underscores the importance of Rule 11 and compliance with the duties outlined in that rule.

- **Form I-862 (Notice to Appear):** Upon providing an inadmissible noncitizen with Form I-862, ICE and/or DHS officers shall provide any potential Bond Eligible Class members with the Notice.

- **Form I-213 (Record of Deportability):** Upon arresting an inadmissible noncitizen, ICE and/or DHS officers must provide confirmation on Form I-213 that the Notice was provided to potential Bond Eligible Class members in their best language within 48 hours of arrest and detention.

**When Notice Shall be Provided:**

- Within 7 days of this Order, Respondents shall serve the Notice on all noncitizens already in immigration detention who Respondents reasonably believe may be members of the class. The Notice shall be in a language the noncitizen understands. Should Respondents not have the Notice translated into a language the noncitizen understands, they shall secure an interpreter to translate the Notice as soon as feasible.

- Starting no later than 7 days after the date of this order, Respondents shall promptly serve the Notice on all noncitizens who are newly arrested or detained by immigration officers and who Respondents reasonably believe may be members of the class. The Notice shall be given at the time the noncitizen is processed in a language the noncitizen understands. Should Respondents not have the Notice translated into a language the noncitizen understands, they shall secure an interpreter to translate the Notice as soon as feasible.

- Respondents shall record the service of each notice and retain a copy of each such notice served.

- Respondents shall provide the noncitizen with access to a telephone to call an attorney within one hour after the noncitizen receives the Notice.

- At the first master calendar hearing, Immigration Judges ("IJs") are ordered to provide the Notice to Bond Eligible Class members and/or confirm the class member's receipt of the Notice at the time of arrest.

**Continuing Reports:** The Court will **STAY** the following portion of the Order for 14 days to permit Respondents to comply with the abovementioned orders. The Court **ORDERS** as follows:

- Within 14 days of this Order, ICE, DHS, EOIR, and Adelanto Detention Facility are to coordinate and provide class counsel for Plaintiff Petitioners a weekly report of Bond Eligible Members presently detained, ICE's custody determination, and information regarding bond hearings requested by class members during that week.

- Within 14 days of this Order, ICE, DHS, EOIR, and Adelanto Detention Facility are to also coordinate and provide the Notice to class counsel for Plaintiff Petitioners a bi-weekly report of the names and A-Numbers of all Bond Eligible Class members who have been released within this judicial district.

Respondents have already wasted valuable time and resources. Worst of all, not only does detention without due process deprive members of the Bond Eligible Class of their liberty, economic stability, and fundamental dignity, but it also harms their families, communities, and the fabric of this very nation.

**IT IS SO ORDERED.**

# APPENDIX

## CLASS ACTION NOTICE

You may be a member of a class that has been certified by the United States District Court for the Central District of California in *Lazaro Maldonado Bautista et al. v. Ernesto Santacruz Jr et al.*, No. 5:25-cv-01873-SSS-BFM (C.D. Cal. 2025).  On December 18, 2025, the District Court issued a ruling that certain immigration detainees may be unlawfully detained and may seek release on bond or conditional parole under 8 U.S.C. § 1226(a).  Therefore, you may be entitled to request release on bond or conditional parole by immigration officers; you may also be entitled to a bond hearing upon your request to the Immigration Court.  At the bond hearing, the Immigration Judge may determine that you are eligible to be released on bond while your removal proceedings are pending.

If you have questions about your potential membership in the class or your rights under the District Court's ruling, you may call the attorneys representing the class at (415) 343-0770.

Served on date: _____

Served at location: _____

Name of person served: _____

Alien number of person served: _____

Name of officer serving notice: _____

ID number of officer serving notice: _____

Signed by serving officer: _____